**Oliver Eugene EVANS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–04–00249–CR.**

Court of Appeals of Texas, San Antonio.

Nov. 2, 2005.

Discretionary Review Granted April 5, 2006.

---

Richard E. Langlois, Law Office of Richard E. Langlois, San Antonio, for appellant.

Laura Burton Bates, Asst. Crim. Dist. Atty., San Antonio, for appellee.

Sitting: CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

## MEMORANDUM OPINION

Opinion by SARAH B. DUNCAN, Justice.

Oliver Eugene Evans appeals the judgment convicting him of possession of a

controlled substance (cocaine) and sentencing him to ten years in the Texas Department of Criminal Justice—Institutional Division. Evans argues the evidence is legally and factually insufficient to support the jury's finding of guilt. We agree the evidence is legally insufficient to raise a reasonable inference that Evans exercised actual care, custody, control, or management of the cocaine and therefore reverse the trial court's judgment and render a judgment of acquittal.

### FACTUAL AND PROCEDURAL BACKGROUND

On November 18, 2002, San Antonio Police Officer Adelbert Patrick Reyes and his partner, Officer David Larios, were "targeting" the 300 block of Henry Street pursuant to a Crime Stoppers tip of high narcotic activity in the area. While sitting in their unmarked police car, around 8:30 p.m., Reyes and his partner noticed a female (later identified as Terry Lee) walk towards a vehicle, make contact with a person in that vehicle, and walk away, only to return approximately fifteen to twenty minutes later as a passenger in a van that was being driven with its headlights turned off. After exiting the van, Lee again walked towards the vehicle with which she had earlier made contact. At this point, Reyes and Larios exited their car and walked towards the van. When Lee started running away, "Larios saw her throw some crack cocaine on the ground." While Larios attended to Lee, Reyes contacted the van's driver (later identified as Robert Ochoa) and backseat passenger (later identified as Cynthia Priestley). After seeing crack cocaine on the floorboards by Ochoa and Priestley, Reyes arrested them. Ultimately, the officers also arrested Lee, who told the officers there were more

drugs at Priestley's home at 923 Lombrano.

After Priestley consented to a search of her home, she was accompanied there by Officers Reyes and Larios, as well as Officers Jesse Allen and Michael Cokerham. When they arrived at Priestley's home, the officers stood on the front porch and, looking through the glass storm door, saw Evans sitting in a chair or on a couch in the living room watching television and talking on the telephone. Approximately one foot in front of him and within arm's reach was a five or six foot coffee table on which was what the officers believed to be crack cocaine in five or six small transparent cellophane or plastic baggies. Also on the coffee table were small bottles with numbers written on their lids [2]; but the officers could not see if they also contained cocaine. Although neither Reyes nor Allen could recall whether there were other items on the coffee table, Allen testified there could have been a "little plate" on it. Leaving Priestley outside in the yard, the officers entered the unlocked door without resistance, at which point Evans hung up the telephone. When the officers then asked Evans if he knew why they were there, he replied "[d]rugs." Evans did not attempt either to flee or to conceal the drugs on the coffee table. Reyes then arrested Evans for possession of a controlled substance.

In their subsequent search of the house, the officers found no one other than Evans in the home and no drugs other than those on the coffee table. Priestley then came inside the home and told the officers on several occasions the drugs were hers and Evans had no knowledge of them. In the living room, the officers found a mail slot containing "a lot of letters with [Evans's]

---

**2.** According to the officers who testified at trial, these numbers indicated the price of the

bottle of cocaine.

name" on them and seized one postmarked October 28, 2002 and addressed to "Mr. Oliver Evans" at "923 Lombrano." In the front bedroom, which was in disarray, the officers found men's clothing, while they found women's clothing in the back bedroom. According to Allen, the house was "cluttered." When the officers searched Evans, they found $160 in cash.

When the substances in the baggies and pill bottles were later tested, they were found to be approximately fourteen grams of cocaine. Evans was indicted on two counts, possession with intent to deliver and possession. At the ensuing trial, Officer Reyes estimated the cocaine found in the baggies and pill bottles on the coffee table would fetch approximately $1,300 on the street. The State's theory of the case was that no one would leave $1,300 worth of cocaine unattended; therefore, the State argued, the jury should find that Priestley and Evans were operating together in dealing cocaine from their "home base" at 923 Lombrano: while Priestley delivered the cocaine, Evans was left in charge of "home base." Evans defended on the ground that he was merely present where the drugs were found and did not exercise actual care, custody, or control over them.

To support his defense, Evans elicited from Officer Allen that Evans did not take any action to touch or try to conceal the drugs, and that the police did not take fingerprints from the baggies or pill bottles to determine whether they had ever been touched by Evans. Officer Allen testified he could not recall whether he obtained from Evans a drivers license that had an address different from 923 Lombrano. The only witness who testified on Evans's behalf was his ex-wife, Josylyn Jorden. According to Jorden, Evans and their two sons had been living at her parents' home at 357 Leonidas (about fifteen miles from 923 Lombrano) since October 7

or 8, 2002. Jorden, who was in the Army and stationed at Fort Hood in Killeen in 2002, would call Evans at her parents' home in the evening or at night after the buses stopped running. Sometimes when she called her kids after school, Evans was not there because he was out looking for a job. Jorden had never sent mail to Evans at 923 Lombrano.

Jorden testified that when she came to San Antonio on the weekends, she stayed with Evans and their children at her parents' home. However, she visited Evans's grandmother's home at 923 Lombrano approximately three times a month so the boys could see their great-grandmother. When she visited, the coffee table in the living room was littered with magazines, trash, candy, prescriptions—just "everything"—and to get to the coffee table from the couch or chair, one would have to get up.

Jorden testified that the family learned in the summer of 2002 that Priestley was involved with drugs and had been selling items (like an air conditioning unit, a stereo, and a television) that she had taken from the home she shared with Evans's grandmother at 923 Lombrano. "It was a huge issue." Accordingly, before traveling to Oklahoma for a few days in November, Evans's grandmother asked Evans to check on her home while she was away.

On the evening Evans was arrested, Jorden received a telephone call from Evans while he was checking on his grandmother's home at 923 Lombrano. At some point, Jorden "heard a lot of scuffling, and then the phone hung up." When Jorden called back, a police officer answered and said Evans was going to jail, so if she wanted to talk with Evans, she would need to go through the county; they never put Evans back on the telephone.

The court's charge instructed the jury that "the term 'possession' . . . meant actu-

al care, custody, control or management of the controlled substance"; and it "is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control." The jury found Evans not guilty of possession with intent to deliver but guilty of possession. Thereafter, in accordance with Evans's election, the court sentenced Evans to ten years in the Texas Department of Criminal Justice—Institutional Division.

### LEGAL SUFFICIENCY

Evans argues the evidence is legally insufficient to support the jury's finding that he exercised actual care, custody, control, or management of the cocaine on the coffee table. We agree.

### Scope and Standard of Review

█ "When deciding whether evidence is [legally] sufficient to support a conviction, a reviewing court must assess all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex.Crim.App.2005). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319, 99

S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In applying this standard, the Texas Court of Criminal Appeals has held that "a fact-finder may disbelieve some or all of a witness's testimony, even when that testimony is uncontradicted." *Hernandez v. State*, 161 S.W.3d 491, 501 (Tex.Crim.App. 2005) (citing *State v. Ross*, 32 S.W.3d 853, 857 (Tex.Crim.App.2000)).[3]

█ "To prove unlawful possession of a controlled substance, the State must prove that: (1) the accused exercised control, management, or care over the substance; and (2) the accused knew the matter possessed was contraband." *Poindexter*, 153 S.W.3d at 405. "Whether this evidence is direct or circumstantial, 'it must establish, to the requisite level of confidence, that the accused's connection with the drug was more than just fortuitous. This is the whole of the so-called 'affirmative links' rule," which "is designed to protect the innocent bystander from conviction based solely upon his fortuitous proximity to someone else's drugs." *Id.* at 405–06 (quoting *Brown v. State*, 911 S.W.2d 744, 747 (Tex.Crim.App. 1995)). "This rule simply restates the common-sense notion that a person—such as a father, son, spouse, roommate, or friend—may jointly possess property like a house but not necessarily jointly possess the contraband found in that house." *Id.* at 406. The Texas Court of Criminal Appeals has "[t]hus ... formulated the rule that '[w]hen the accused is not in exclu-

---

**3.** The Supreme Court of Texas, on the other hand, has recognized that "[d]isregarding undisputed facts that do not support the finding could skew the analysis" of whether the evidence is legally sufficient to support a fact finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 814 (Tex.2005) ("[A]n appellate court conducting a legal sufficiency review cannot 'disregard undisputed evidence that allows of only one logical inference.' By

definition, such evidence an be viewed in only one light; and reasonable jurors can reach only one conclusion from it. Jurors are not free to reach a verdict contrary to such evidence."); *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 629 (Tex.2004) ("But while our [legal sufficiency] review must acknowledge reasonable inferences that may have been drawn by the jury, it cannot ... disregard undisputed evidence.")

sive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband.'" *Id.* (quoting *Deshong v. State,* 625 S.W.2d 327, 329 (Tex.Crim.App.1981)). "Mere presence alone at a place where the contraband is being used or possessed by others does not justify a finding of joint possession, or constitute one a party to an offense." *Martin v. State,* 753 S.W.2d 384, 387 (Tex.Crim.App.1988); *see also Meeks v. State,* 692 S.W.2d 504, 511 (Tex.Crim.App. 1985). Rather, the requisite affirmative links may be established by showing additional facts and circumstances that raise a reasonable inference of the defendant's knowledge and control of the contraband. *Meeks,* 692 S.W.2d at 511. The Fourteenth Court of Appeals recently summarized a non-exclusive list of factors that have been found to affirmatively link an accused to contraband as follows:

(1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether

the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Olivarez v. State,* 171 S.W.3d 283, 291 (Tex.App.-Houston [14th Dist.] 2005, no pet.); *see Puente v. State,* 888 S.W.2d 521, 526 (Tex.App.-San Antonio 1994, no pet.). And, in *Poindexter,* the Texas Court of Criminal Appeals found it significant both that "there was no affirmative evidence that any other person lived in the same house or exercised care, control, or custody over either the house or the drugs" and that there was no evidence that another person, "even if she exercised joint possession of the house, exercised exclusive possession over the drugs." *Poindexter,* 153 S.W.3d at 412. Thus, "[t]he number of factors present is not as important as the logical force the factors have in establishing the elements of the offense." *Gilbert v. State,* 874 S.W.2d 290, 298 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd). Accordingly, "[w]hile affirmative links may be proved by circumstantial evidence, proof amounting to a strong suspicion or even a probability will not suffice." *Lassaint v. State,* 79 S.W.3d 736, 741 (Tex.App.-Corpus Christi 2002, no pet.) (citing *Grant v. State,* 989 S.W.2d 428, 433 (Tex.App.-Houston [14th Dist.] 1999, no pet.) citing *Dubry v. State,* 582 S.W.2d 841, 844 (Tex. Crim.App. [Panel Op.] 1979))).

### Discussion

■ The State argues it "produced evidence of six affirmative links." "First and foremost, Evans was found seated arm's length away from numerous baggies and pill containers of crack cocaine in plain view" when the search was conducted. However, "[m]ere presence alone at a place where the contraband is being used or possessed by others does not justify a finding of joint possession, or constitute

one a party to an offense." *Martin,* 753 S.W.2d at 387; *see also Meeks,* 692 S.W.2d at 511. The second affirmative link asserted by the State is that Evans "was the sole occupant of the house." However, the State's assertion is belied by its admissions that "923 Lombrano ... was Priestley's home address"; and it was Priestley who signed a form consenting to search "her residence." Since 923 Lombrano was Priestley's home address, Evans could not have been its "sole occupant." *See* BLACK'S LAW DICTIONARY 973 (5th ed.1979) (defining "occupant" as "[p]erson in possession," "[p]erson having possessory rights, who can control what goes on premises," "[o]ne who has actual use, possession or control of a thing").

The next affirmative link recited by the State is that, "when the police officers asked [Evans] if he knew why they had come to the house, he replied, 'Drugs.'" We fail to see how Evans's response is incriminating, however. Merely indicating knowledge that drugs were present and the reason for the officers' presence does not raise a reasonable inference of care, custody, or control of those drugs, particularly in light of the undisputed evidence of the family's knowledge of Priestley's involvement with drugs and her arrest for selling drugs only moments before. The State next points us to "a letter that had been mailed to [Evans], one month before the offense occurred, at the same address at which he was found with the drugs." As the State admits, however, this letter was postmarked one month before Evans was arrested. *See Higgins v. State,* 515 S.W.2d 268, 270 (Tex.Crim.App.1974) (noting that "letters addressed to appellant were found in the house" but "they were not recent and no other evidence was introduced to show he occupied the premises"). The State refers next to the fact that "men's clothing was found in one of the bedroom closets in the house in which

the drugs were found"; however, the State made no absolute showing that any of the men's clothing found in the front bedroom belonged to Evans. Finally, the State points to the fact that Evans "was found with $160 on his person." However, we do not consider $160 to be such a large amount of cash in today's times that it will yield a reasonable inference of illegal activity.

The remaining factors suggested by the Fourteenth Court of Appeals in *Olivarez* likewise do not support an inference of guilt: when Evans was arrested, he was not under the influence of narcotics, he was not found to possess other contraband, narcotics, or drug paraphernalia, he did not attempt to flee, and he did not make furtive gestures; and there is no evidence of either an odor of contraband in the home or the presence of other contraband or drug paraphernalia, the State produced no fingerprint evidence linking Evans with the cocaine, and, so far as we can discern, nothing about Evans's conduct indicated a consciousness of guilt. In short, viewing the evidence in the light most favorable to the prosecution, the only factors that support a finding that Evans exercised care, custody, control, or management of the cocaine are his presence and the cocaine was in plain view on the coffee table approximately one foot in front of him when the search was conducted. Under these circumstances, we conclude the evidence is legally insufficient to affirmatively link Evans to the cocaine. *See Collins v. State,* 901 S.W.2d 503 (Tex.App.-Waco 1994, pet. ref'd) (holding evidence was legally insufficient to affirmatively link defendant with cocaine and heroin when the defendant was present when the house was searched, lived there "off and on," the electricity bill was in his name, the narcotics were in plain view in a bedroom, and needles and paraphernalia were found all over the

house; but another resident testified the drugs were his, there was no evidence the defendant had touched the drugs, he was not under the influence of narcotics and did not have any contraband on his person, and he did not attempt flight or make any furtive gestures); *Higgins*, 515 S.W.2d at 271 (noting "there were no res gestae statements, no fingerprints, no indication that appellant was under the influence of narcotics, no attempt to escape, no furtive gestures, nor any other circumstances which would connect appellant with the LSD in the present case"); *see also Lassaint*, 79 S.W.3d at 745–46 (collecting cases). And, although the State argued that, while Priestley made deliveries, Evans was protecting the cocaine at "home base," the State failed to introduce any evidence even suggesting that Evans was armed or that any weapons were recovered from 923 Lombrano at all. *See, e.g., Lassaint*, 79 S.W.3d at 745 (noting defendant "was not armed, nor were any weapons recovered").

### CONCLUSION

As recently reiterated by the Texas Court of Criminal Appeals, the affirmative links rule is designed to protect an "innocent bystander" who is in "fortuitous proximity to someone else's drugs." *Poindexter*, 153 S.W.3d at 406. We of course do not know whether Evans was in fact an "innocent bystander." But the record before us—the record before the jury—permits no other conclusion because it fails to affirmatively link Evans to the cocaine other than by his presence and its proximity. We therefore reverse the trial court's judgment and render a judgment of acquittal.