TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN









TEXAS
COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

 

 

 

NO. 03-06-00492-CR

 

 

 

John
Merritt Pierce, Appellant

 

v.

 

The State of Texas, Appellee

 

 

 

FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT

NO. CR-05-639, HONORABLE WILLIAM
HENRY, JUDGE PRESIDING

 

 

M E M O R A N D
U M   O P I N I O N

 

                        John
Merritt Pierce appeals his conviction for possession of methamphetamine in an
amount of 200 grams or more but less than 400 grams.  See Tex. Health & Safety Code Ann. §§ 481.102 (West Supp. 2006), .115(a), (e) (West 2003). 
After the jury found appellant guilty as to possession,[1]
the trial court assessed punishment at 39 years’ confinement as enhanced by a
prior conviction.  In two issues, appellant challenges the legal and factual sufficiency
of the evidence to support his conviction for possession of methamphetamine. 
Because we sustain the challenge to the legal sufficiency of the evidence to
support the verdict, we reverse the trial court’s judgment and render a
judgment of acquittal.

 

                                                               BACKGROUND

                        According
to the State’s evidence at trial, on the afternoon of June 23, 2005, Detective
Tommy Villanueva of the Hays County Narcotics Task Force unit of the San Marcos
Police Department received an anonymous telephone call that a fugitive, Dolores
Burnett, with an escape warrant from Travis County, could be found at a
residence at 2735 FM 2001 in the town of Buda in Hays County.  The caller also
advised the officer that Burnett was “staying with a man by the name of John
Pierce,” that the residence was “a place where a lot of people do
methamphetamine and cocaine,” and that there would be a black Chevy Blazer and
possibly a blue Mitsubishi vehicle “that was supposedly Dolores Burnett’s
vehicle” located at the residence.

                        Villanueva
verified the existence of the warrant and learned that Burnett had a warrant
for an unauthorized absence from a community corrections facility.  At trial,
the State introduced into evidence a printout from a law enforcement database
showing the existence of a “flight escape warrant” as well as an additional
warrant for Burnett for possession of methamphetamine in violation of her
probation.

                        San Marcos police officers conducted a drive-by investigation of the residence, verifying
the location and existence of the residence and the black Chevy Blazer. 
Because the house was located 100-150 feet from the road, they were unable to
see the license plates of vehicles parked close to the residence.  They
confirmed that a black Chevy Blazer was parked at the residence along with
other vehicles.

                        Based on
the information received from the anonymous caller and their observations, at
mid-afternoon the officers approached the residence to knock on the front door
and to serve the warrant on Burnett.  Villanueva testified that the officers
waited on the blue vehicle that supposedly belonged to Burnett, but then they
decided to knock on the door and ask if she was there.  As other officers “set
up a loose perimeter around the residence,” Sergeant Chase Stapp, a sergeant
with the San Marcos Police Department and the commander of the Hays County
Narcotics Task Force, approached the southwest corner of the house to observe
the side of the house in the event someone tried to flee.  Stapp explained the
purpose of a “knock-and-talk” investigation:

 

You try to make contact with someone at
a location and obtain their cooperation in conducting your investigation
whether it be for a warranted person or to find drugs, which is commonly what
we do, or anything else. . . . You knock on the door, you hope to make contact
with someone, and talk to them about whatever it is you’re investigating.  We
do these to, again, try and find drugs sometimes where we don’t have a search
warrant in hand, but we want to elicit cooperation from people.  We also do
these many times to try to serve arrest warrants.  The law would allow us to
breach a door or break down a door to serve a felony arrest warrant if
someone—if your suspect actually lives there, but if they don’t, we—if they’re
staying at a friend’s house, for example, or hiding out or whatever, we may
knock on that door and try to get someone to answer the door and just ask if
the wanted person is there.[2]

 

As he moved close to an open window
of the house, Stapp smelled the “unmistakable odor” of methamphetamine and
observed through the window a man, later identified as Shane Forester, and an
unidentified woman inside the house.  The woman was walking quietly past the
door in an attempt, Stapp testified, to avoid detection of the officers at the
front door.  Stapp observed the man carrying a blue “kind of a” square object
into the room.  When the man saw Stapp at the window, he ran towards the living
room.  When no one responded to Villanueva’s knock at the front door, Stapp
authorized him “to kick the front door open.”  Stapp testified that he was
concerned that evidence might be destroyed or weapons obtained, so he
authorized an entry into the house based upon exigent circumstances.[3]

                        When the
officers entered the house at approximately 2:45 p.m., Dolores Burnett, who was
taking a shower, was the only person present.  Stapp testified that Burnett was
not the female he observed through the window.  The officers “cleared the
house” and found no one else present in the house. The man and woman Stapp saw
through the window were not found in the house. The officers observed debris
outside one of the windows of the house, indicating that someone had escaped
through the window into a large open field behind the house.  Stapp testified
that “[t]hey got out the side window and dropped some belongings on the ground
and the blinds had been moved outside the window.”  The officers found
evidentiary items, including plastic tubing and tape, stashed in a brushy area
behind the house.  Villanueva testified that the officers also found a cell
phone and a belt buckle on the ground.

                        Villanueva
testified that, as the officers “cleared” the house looking for additional
occupants, they observed in plain view in the kitchen “a square glass tray with
some powdery residue, a small scale, and small Ziploc baggies.”  Villanueva
testified that the items he observed were consistent with “the manufacturing of
methamphetamine:”

 

In the washroom where the entry was
made by the other officers, detectives observed in plain view two glass jars
inside a soft-sided bag:  one jar contained clear liquid with some white
residue, and the second jar contained some clear liquid.

 

After a search of the house looking
for individuals who might be present, the officers started looking around the
property for the individuals.  They searched an outbuilding, or “shed,” and
also saw the blue Mitsubishi automobile parked in back of the house.  After
“clearing” the outbuilding and finding no one there, the officers began to
search more widely for the individuals they believed had fled from the house. 
Officers spoke with employees at a nearby cabinet shop who had seen “people
going through here.”  The employees provided “a very basic description of the
suspects”[4]
that the officers passed on to other law enforcement officers, including other
members of the Hays County Sheriff’s Office, the Department of Public Safety
Air Unit, the San Marcos Police Department Canine Unit, and the United States Marshals, who assisted in the search. 

                        As the
officers continued their search for the individuals, Villanueva left the
residence and proceeded to seek a search warrant which was issued by a
magistrate later that afternoon at 5:05 p.m.  Other officers remained at the
house to secure the premises until the search warrant could be obtained.

                        Meanwhile, United States Marshals were in nearby Niederwald looking for a fugitive in an unrelated
case.  U. S. Deputy Marshal Tom Shaddix testified that he observed two
individuals running in an open field “quite a distance off the road.”  The two
men would run and occasionally stop to see if they were being followed.  The
marshal’s first impression was that the men were being chased by a dog or a
bull.  As Shaddix continued to drive down the road, the two men continued to
run, and then stop and walk, and then run again until Shaddix lost sight of
them.  As Shaddix waited for another officer, a Hays County officer advised him
that “some individuals” had run from a house where the officers were attempting
to execute a “search warrant” and asked him if he had seen anybody.  After
executing the arrest for which they were in the area, at the request of the Hays County officers, the marshals assisted in the search for the men who had fled the Buda
residence.

                        Shortly
thereafter, Shaddix again saw two men near the road, one coming out of a brushy
area on the edge of the road and a second man running in the opposite direction
from the marshals.  The first man was “not moving.”  As he watched, an old
Suburban vehicle coming in Shaddix’s direction stopped, picked up the second
man who was running, made a u-turn “in the middle of the road spinning his
tires,” and headed back in the direction from which it had come.  Shaddix
testified:

 

It appeared he was trying to get away
in a hurry.  I proceeded after him, got behind him, activated my lights and
siren, attempted to pull him over.  The individual driving made a right turn
onto another road that I do not know the name of.  I proceeded behind them
probably a quarter to a half mile down the road until it ended, at which time
they stopped—the vehicle stopped.

 

Shaddix detained the two men until Hays County officers arrived.  Shaddix placed the car’s passenger, the man who had been
running, in handcuffs.  At trial, Shaddix testified that the passenger appeared
extremely “wet from sweat,” flustered, and nervous.  The driver was nervous but
not sweating.

                        U.S. Deputy
Marshal Eric McGill, who apprehended the other individual on the road,
testified that he saw the two men go “up a ditch,” “they were in the weeds,”
and then “cross a field.”  He then saw the men as one jogged along the road and
the other walked on the side of the road.  The individual walking along the
road was shirtless and was cut up, bleeding, and sweaty.  McGill lost sight of
the men until he turned down another road and saw the men again.  He approached
one of the men and asked whether anything was wrong.  The man replied that he
was fine and kept walking.  McGill testified that when he initially approached
the man, “I was under the misunderstanding that we were actually looking for
Hispanic individuals, and this was a white male.”  McGill then stopped his
vehicle, showed his badge, and asked the man what he was doing.  The man told
McGill that he was “there to meet somebody about a job.”  McGill testified that
because he thought the individual might have fled from the Buda house and was
one of the individuals sought by the local officers, he told the man:  “I’m not
arresting you, but I am going to detain you until we identify you.”  He then detained
the man, later identified as appellant, for identification purposes.  McGill
brought appellant to the location where Shaddix had detained the two men in the
Suburban—the passenger was later identified as Shane Forester, and the driver
was his brother, Hoyt.  The marshals turned appellant and Shane Forester over
to the officers and released Hoyt Forester.

                        The record
reflects that the three men were detained in the 3000 block of Windy Hill Road, approximately a quarter to one-half mile from the Buda residence.  Officer
Carl Spriegel of the Hays County Narcotics Task Force arrived and took custody
of appellant and Shane Forester from the U.S. Marshals.  Spriegel, who also
participated in the execution of the arrest warrant at the Buda residence, described
appellant and Forester when he first saw them in the custody of the marshals:

 

Very disheveled looking; they were very
sweaty; they were covered in what we refer to as beggar’s lice, the—it’s black
material when you go through a field, it attaches to your clothing and
whatnot—they were covered head to toe in this beggar’s lice.

Spriegel recalled that one of the
men was shirtless.  After handcuffing appellant and Forester and frisking them
for weapons and contraband—which they did not find—Spriegel seated them in the
back seat of his squad car and transported them to the Hays County jail.

                        On their
way to the jail, Spriegel drove by the Buda residence for Officer Stapp to view
the two men.  Stapp came over to the police vehicle and identified Forester as
the man he saw through the window carrying the blue object; Stapp testified
that he had not observed appellant at the house.  When Spriegel arrived at the
jail and unloaded the two suspects, he found a “little baggy of a white
crystalized substance” underneath the rear seat of the car.  Spriegel observed
that the baggy was “extremely wet,” “literally dripping with perspiration,” and
there was actually perspiration on the inside and outside of the baggy.  The
State designated the baggy as State’s Exhibit 9A.

                        In his
testimony, Spriegel explained that he generally operates a marked patrol unit
and that every time he operates the unit he conducts a search of the vehicle. 
He testified that before each use of the vehicle he searches the entire car,
including the back seat and every place “that you can conceal something.”  In
describing the location of the baggy “underneath the rear seat,” Spriegel
testified:  “It was—it looked as if it was going to be more towards the center
of the car, but it was closest to Mr. Pierce.”  On cross-examination in
response to questioning on the location of the baggy, Stapp testified that the
baggy was underneath the seat of the car “between the padding of the seat and
the rubber padding that lines the floor of the car of approximately an inch,
and it was in that area,” in the “void between the seat back and seat cushion
itself.”  Stapp testified that it was “possible” that either person sitting in
the back seat could have dropped the baggy.

                        After the
officers obtained the search warrant, they conducted a search of the house and
premises, seizing “approximately 32 items of evidence” and photographing the
evidence and the house.  Villanueva testified to the conduct of the search[5]
and the seizures he made.  In a closed kitchen cabinet located to the right of
the kitchen sink, he found two 20-ounce plastic bottles, one filled with liquid
separating into two distinctive layers.  He also seized the scale and baggies
observed on the kitchen table during the initial sweep of the house.  The
baggies were empty; in Villanueva’s experience, they “are usually used to carry
small amounts of any narcotic.”  Villanueva testified that the officers
photographed the bottles, measured the liquids inside, and took samples of the
liquid for testing.  Villanueva picked up a cell phone laying on the ground,
next to the house.  When it rang and Villanueva answered it, a voice on the
other end asked to speak to “Kenny.”  The telephone was not fingerprinted. 
After the officers seized and photographed the evidence and crime scene, most
of the materials were then disposed of as hazardous waste by a clean-up crew. 
No fingerprints were retrieved from the house or evidence.[6]

                        Some of the
evidence was found in a bin in a brushy area behind the house.  The items
included cold medicine containing pseudoephedrine, plastic tubing, tape, power
strip, hot plates, glassware of various types, funnels and dishes used for
drying the final product.  The officers also seized charcoal lighter fluid that
they testified is a solvent that can be used to extract a chemical during the
cooking process, red phosphorus, eleven boxes of pseudoephedrine used to
“synthesize into methamphetamine,” a condenser tube, and a triple-beam scale.

                        Laray
Taylor, a detective with the San Marcos Police Department, also assisted with
the execution of the search warrant.  Taylor testified that he personally
seized various items from the residence, including Red Devil Lye, acetone,
muriatic acid, pipes used to smoke methamphetamine, a woman’s driver’s license,
some hydrocodone, an unknown tablet, and some methamphetamine in a tray.  Taylor scraped the methamphetamine out of a glass tray and placed it in a baggy.  He also
testified that he seized “an affirmative-link document,”[7]
which was a traffic citation dated December 2, 2004, issued to appellant and
located on a desktop in one of the bedrooms.  Admitted into evidence, the
citation showed appellant’s residence as 2735 FM 2001 and the vehicle for which
the citation was issued was a 1994 silver Dodge automobile.  The citation
showed that appellant received a ticket in Bastrop County for traveling at a
speed of 85 miles per hour in a 60-mile-per-hour zone.  The citation also
showed that appellant received a warning for displaying an expired registration
sticker and for failing to have insurance.

                        Hays County
deputy sheriff Todd Riffe testified that he seized various items from “the
brush line behind the house” including boxes of Equaline allergy medicine
located in a hunting bucket, six glass containers, seven plastic funnels, a
methamphetamine pipe, three burners, plasticware, two glass dishes, a
six-weight test strip, coils of plastic tubing, a baster and gloves located in
a tool case, 456 empty pseudoephedrine pill tablets, and plastic tubing.  He also
seized a glass condenser tube located on the living room floor of the
residence.  Riffe testified that these items were “previously used for the
production of methamphetamine.”

                        Joel Budge,
the supervisor of the DPS drug analysis lab, testified that he was the chemist
who conducted tests on various exhibits in the case.  Budge testified that the
exhibits believed to contain controlled substances were submitted to him, and
certain of the exhibits were analyzed and found by him to contain
methamphetamine.  As to two of the exhibits that contained methamphetamine,
Budge testified:  “Using the officers’ pictures and their descriptions
from—that were given to me, I determined that item No. 1A and 1B—that the total
volume was probably 316 milliliters, and that corresponds to about 221 grams of
total weight.”[8] 
As to Exhibit No. 2, Budge testified that there was a top layer and a bottom
layer and that he tested only the top layer.  If one included both layers, the
mixture that contained methamphetamine weighed 316 grams, but the top layer
that he tested weighed 38 grams.  Several of the other exhibits were items used
in the manufacture of methamphetamine, such as iodine and pseudoephedrine
pills.  Budge confirmed the existence of 5.50 grams and 0.23 grams of methamphetamine
in two other exhibits.  Budge testified that he did not analyze exhibits marked
M360, which is a manufacturer’s code for hydrocodone, and Risperdal.  The
record does not show that Budge tested the crystallized substance in the baggy
found in the squad car underneath the seat.

                        Appellant
called three witnesses to testify on his behalf, as well as Officer Villanueva.
Linda Pyron testified that she had known appellant for two years, that they
were intimate friends, and that appellant had been at the residence until
mid-May 2005 when she helped him pack his belongings and move out of the
house.  Appellant was not staying at the house in June.  She did not know how
long appellant had lived at the house, but she knew that appellant would allow
others to stay with him at the house.  Pyron testified that appellant had his
own business crushing cars for junkyards and that he lived in the city of Alamo, near the border, and sometimes worked in Bertram where his office was located. 
Pyron had traveled with appellant to both Alamo and Bertram where appellant
lived in a cabin.

                        Pyron
recounted that, in late March or early April, Shane Forester’s brother, Hoyt,
along with another person named “Jeff” were staying with appellant at the
house.  When Pyron and appellant returned home from an out-of-town trip,
appellant “found things in the house that he was not happy with at all.”  Pyron
recalled that appellant was angry and very upset and that he loaded up jars,
baggies, cooking pots and “visionware” in a truck and removed the items:

 

I saw him start gathering it up,
looking, finding, searching through the trash, searching everywhere through his
whole house.  And he gathered up everything that he found, put it in a box–two
boxes, actually, and put it in Jeff’s truck and shortly after that, he left to
go get rid of it.

 

Pyron testified that the items
appellant disposed of had something to do with methamphetamine.  She testified
that when appellant threw the items away he would not let her go with him
“because he didn’t want to endanger me.”  When Jeff returned to the house,
Pyron saw appellant “take Jeff to another room to talk to him,” and she heard
raised voices.  Although Jeff continued to come and go at the house, he no
longer lived there.  Pyron testified that she was a convicted felon, having
pleaded guilty to possession of methamphetamine in 2002.

                        Dolores
Burnett also testified on appellant’s behalf.  She testified that she was in
the shower when the officers arrived and knocked on the front door of the
residence.  Appellant was a long-time friend, and Burnett had previously stayed
at the house.  Although Burnett testified that the residence “was [appellant’s]
home” and he told her she could stay there, she had not stayed at the house
recently and was aware that he was no longer living at the house.  She was “not
sure” who was living at the house and, on the morning in question, saw only
Shane Forester and a person named “Wendy” at the house:

 

I think it was Wendy and Shane that was
living there, I’m not sure.  I had seen a lot of people there a couple of
times.  Sometimes there was Hoyt, Faith, Wendy, and Shane.  But just that
morning I just saw Wendy and Shane.

 

She was not sure whether an
individual named Kenny Rictoby was there that day. [9]


                        Burnett
testified that she arrived at the house in her car at approximately 10:00 p.m.
and then slept in her car parked behind the house until later that night.  At
about 3:00 or 4:00 a.m., Burnett entered the house and fell asleep on the
couch.  She testified that she slept until mid-afternoon when she got up to
take a shower:  “I went in and fell asleep on the couch and woke up and went
straight to the shower, and that’s when the cops came in.”  Although she
testified that she did not see appellant at the house that day, on
cross-examination Burnett testified that she did not know who was on the
property that day and that it was “possible” appellant was at the house that
day.

                        Burnett
admitted that she had fled the treatment facility and that “pretty much” the
first place she went was a place where she knew methamphetamine was available. 
Burnett testified that she has a record of three or four felonies and “a couple
of misdemeanors,” was on probation in Travis County, and that she had walked
away, or escaped, from the treatment facility.  At the time of trial, she was
on probation for escape and for possession of methamphetamine.

                        Appellant’s
next-door neighbor testified that she had lived on the property next door to
appellant until he moved out prior to June.  He was a “nice neighbor.”  After
appellant left, she often saw other people at the house and knew appellant was
no longer living there.  On the day in question, she saw two “guys” who were at
the house “take off running;” she was unaware appellant was found in the vicinity. 
Appellant did not testify. 

                        At the end
of trial, the jury found appellant guilty of possession of methamphetamine, and
a mistrial was declared on a count of possession of chemicals with intent to
manufacture methamphetamine.  This appeal followed.

 

                                                                  DISCUSSION

                        On appeal,
appellant challenges the legal and factual sufficiency of the evidence to
support the conviction.  Specifically, appellant urges that the State failed to
“affirmatively link” him to the contraband.  Because the evidence is legally
insufficient to support the verdict, we will confine our discussion to that
ground because it is dispositive of this appeal.  See Tex. R. App. P.
47.1.

                        In a legal
sufficiency review, we view the evidence in the light most favorable to the
verdict and decide whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 316 (1979); Hampton v. State, 165 S.W.3d 691, 693
(Tex. Crim. App. 2005); Moff v. State, 131 S.W.3d 485, 488 (Tex. Crim. App. 2004).  In addition, we should “determine whether the necessary inferences
are reasonable based upon the cumulative force of all the evidence when viewed
in the light most favorable to the verdict.”  Hooper v. State, 214 S.W.3d
9, 16-17 (Tex. Crim. App. 2007).

                        We consider
all evidence the jury was permitted to consider.  Moff, 131 S.W.3d at
488.  The jury is the sole judge of the credibility of the witnesses and of the
weight assigned to their testimony and may accept or reject any or all of a
witness’s testimony.  Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). 
We resolve any inconsistencies in the evidence in favor of the verdict.  Id.; Matson v. State, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991); Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988).  The verdict
may not be overturned unless it is irrational or unsupported by proof beyond a
reasonable doubt.  Matson, 819 S.W.2d at 846.

                        The State
is required to prove every element of the offense set forth in the indictment
beyond a reasonable doubt.[10] 
See Juarez v. State, 198 S.W.3d 790, 793 (Tex. Crim. App. 2006) (stating
that elements of offense must be charged in indictment, submitted to jury, and
proven by State beyond reasonable doubt).  A person commits the offense of
possession of a controlled substance if he knowingly or intentionally possesses
it.  Tex. Health & Safety Code Ann. § 481.115(a).  Under this indictment,
the State had to prove beyond a reasonable doubt that the accused (i)
intentionally or knowingly (ii) possessed, i.e., exercised actual care,
custody, control, and management over methamphetamine (iii) in an amount of
more than 200 grams but less than 400 grams on or about the date set forth in
the indictment.  See Tex. Health & Safety Code Ann. §§ 481.002(38),
.112(a); Poindexter v. State, 153 S.W.3d 402, 405-06 (Tex. Crim. App.
2005); Brown v. State, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995).  The
State alone has the burden of proving beyond a reasonable doubt every essential
element of the offense charged.  Wright v. State, 603 S.W.2d 838, 840
(Tex. Crim. App. 1980).

                        When the
accused is not in exclusive possession or control of the place where the
contraband is found, it cannot be concluded that he had knowledge of and
control over the contraband unless there are additional independent facts and
circumstances linking him to the contraband.  Poindexter, 153 S.W.3d at
405.  These elements may be established by circumstantial evidence.  Id. at 405-06; McGoldrick v. State, 682 S.W.2d 573, 578 (Tex. Crim. App.
1985).  The evidence must establish, to the requisite level of confidence, that
the accused’s connection with the contraband was more than just fortuitous.  Poindexter,
153 S.W.3d at 406; Brown, 911 S.W.2d at 747.  This link or connection
generates a reasonable inference that the accused knew of the contraband’s
existence and exercised control over it.  Id.  There is no set formula
of facts necessary to support an inference of knowing possession.  The force of
these links need not be such as to exclude every other alternative hypothesis
except the defendant’s guilt.  Id. at 748.  Possession of contraband
need not be exclusive, and evidence that shows an accused jointly possessed the
contraband with another is sufficient.  Martin v. State, 753 S.W.2d 384,
387 (Tex. Crim. App. 1988); Whitworth v. State, 808 S.W.2d 566, 569
(Tex. App.—Austin 1991, pet. ref’d).  But mere presence at the location where
drugs are found is insufficient, by itself, to establish actual care, custody,
control or management of those drugs.  Evans v. State, 202 S.W.3d 158,
162 (Tex. Crim. App. 2006).

                        The State
maintains that it demonstrated that appellant exercised actual care, control,
custody or management over the methamphetamine at the residence and in the
patrol car.  As the State argued in response to appellant’s motion for an
instructed verdict, which was overruled:

 

[T]here’s plenty of evidence that the
jury can use to make inferences and conclusions that suggest that Mr. Pierce
was, in fact, at the house and was, in fact, involved in this incident given
his behavior following the police raid upon the house.

 

It’s true he was not seen by any of the
officers in the house, but he was found in close proximity there on foot,
covered from head to toe with grass burs, and was cut up, which the jury can
certainly make the inference that he was fleeing from the residence and trying
to escape detection and escape capture.  So, the jury can certainly infer that
he was in the house and was involved.

 

And he was found, along with Shane
Forester who was definitely seen in the house. And there w[ere] two individuals
seen running across a field.  Although they were not positively identified, I
find it hard to believe that there would be more than one set of two
individuals running around fields in Hays County near this residence at the
time of the police raid.

 

And in closing argument to the
jury, the prosecutor acknowledged: 

 

John Pierce has never been seen by the
detectives and was not seen by the detectives in that house on that day.  And I
told you that at the outset, that none of our witnesses would say that, and it
shouldn’t come to any great shock to anybody that we didn’t produce somebody
that said, yeah, they saw John Pierce in the house, because none of our
detectives did.

As the prosecutor argued, there was
no question that there was a methamphetamine lab and methamphetamine was
recovered in the amount alleged in the indictment:  “The real question is whether
or not John Merritt Pierce had anything to do with it.”  Relying on the
affirmative-links rule, the State argues that the evidence was sufficient to
link appellant to the methamphetamine.  See Poindexter, 153 S.W.3d at
405-06.

                        Appellant
argues that no testimony links him to the Buda residence at the relevant time
period and that no witnesses testified that he exercised care, custody,
control, or management over the exhibits found to contain the controlled
substance.  Appellant asserts that any link to the residence was insufficient
to establish his guilt, given that no one testified that they saw him at the
house on the day in question and, even assuming he was linked to the residence
in some manner, he was not in exclusive possession or control of the residence
where the contraband was found.

                        In
reviewing this record, we must determine whether any rational trier of fact
could have found beyond a reasonable doubt that appellant knowingly or
intentionally possessed the contraband found in the Buda residence.  To
obtain a conviction for possession of a controlled substance, the State must
prove that the accused exercised actual care, custody, control, or management
over the contraband, and that the accused knew the matter possessed to be
contraband.  Whitworth, 808 S.W.2d at 568.  The trier of fact determines
whether the factors presented at trial combine to link the accused and the
contraband in a sufficient manner to establish guilt beyond a reasonable
doubt.  The number of factors present is less important than the logical force
of those factors, alone or in combination, in establishing the elements of the
offense.  Id. at 569.

                        Courts have
identified relevant factors that may link an accused to contraband, either
singly or in combination, to establish a person’s possession of contraband:

 

(1) the defendant’s presence when a
search is conducted; (2) whether the contraband was in plain view; (3) the
defendant’s proximity to and the accessibility of the narcotic; (4) whether the
defendant was under the influence of narcotics when arrested; (5) whether the
defendant possessed other contraband or narcotics when arrested; (6) whether
the defendant made incriminating statements when arrested; (7) whether the
defendant attempted to flee; (8) whether the defendant made furtive gestures;
(9) whether there was an odor of contraband; (10) whether other contraband or
drug paraphernalia were present; (11) whether the defendant owned or had the
right to possess the place where the drugs were found; (12) whether the place
where the drugs were found was enclosed; (13) whether the defendant was found
with a large amount of cash; and (14) whether the conduct of the defendant
indicated a consciousness of guilt.

 

See Evans, 202 S.W.3d at 162
n.12 (citing Olivarez v. State, 171 S.W.3d 283, 291 (Tex. App.—Houston [14th Dist.] 2005, no pet.)).  These are some non-exclusive factors that may
circumstantially establish the legal sufficiency of the evidence to prove a
knowing possession.  Id.

                        Generally,
courts have found evidence legally sufficient to show possession where the
appellant actually possessed the drugs or had access to the place where the
drugs were stored.  Christopher v. State, 639 S.W.2d 932, 935-36 (Tex.
Crim. App. 1982) (defendant had key to camper shell where drugs found), overruled
on other grounds, Preston v. State, 700 S.W.2d 227, 230 (Tex. Crim.
App. 1985); Martinets v. State, 884 S.W.2d 185, 188 (Tex. App.—Austin
1994, no pet.) (defendant was driver of car in which drugs found); Watson v.
State, 861 S.W.2d 410, 415 (Tex. App.—Beaumont 1993, pet. ref’d) (defendant
in same hotel room with warm crack pipe); Hernandez v. State, 867 S.W.2d
900, 905 (Tex. App.—Texarkana 1993, no pet.) (defendant had key to lock on
spare tire where drugs found); cf. De la Garza v. State, 898 S.W.2d 376,
379 (Tex. App.—San Antonio 1995, no pet.) (defendant seen in possession of
dufflebag containing marihuana immediately before her arrest).  In Whitworth,
this Court upheld a conviction for possession where the defendant had a key to
the trunk of the car, he used the key to open the trunk, marihuana was found in
the trunk, the strong odor of fresh marihuana was present, and the defendant’s
conduct at the time of his arrest showed consciousness of guilt.  808 S.W.2d at
569-70.

                        We recognize
that it is the jury, not the reviewing court, that chooses between alternate
reasonable inferences to be drawn from the evidence.  See Evans, 202
S.W.3d at 165.  In a legal sufficiency review, when reviewing all the evidence
in a light most favorable to the verdict, courts must assume that jurors made
all inferences in favor of their verdict if reasonable minds could, and
disregard all other inferences.  Id. (citing City of Keller v. Wilson,
168 S.W.3d 802, 821 (Tex. 2005)).  We find Evans instructive.  In Evans,
the defendant argued that the evidence was legally and factually insufficient
to prove, beyond a reasonable doubt, that he exercised actual care, custody,
control, or management of the contraband.  On appeal, the court of appeals
agreed, concluding that the record evidence failed to affirmatively link
appellant to the drugs other than by evidence of his presence and proximity to
the drugs.  See Evans v. State, 185 S.W.3d 30, 37 (Tex. App.—San Antonio
2005), rev’d, 202 S.W.3d 158 (Tex. Crim. App. 2006).  In contrast,
because the defendant was sitting directly in front of the drugs and they were
within arms’ reach, the court of criminal appeals concluded that this evidence
constituted “two extremely strong ‘presence’ and ‘proximity’ links.”  Evans,
202 S.W.3d at 163.  The drugs were “right under his nose,” but they were also
in plain view, which the court found to be a third link.  Id.  The court
found a fourth link in that the defendant was alone in the house.  Id.  And when the police arrived and asked if he knew why they were there, Evans
replied:  “Drugs.”  Thus, a fifth link.  Id.  Evans also received mail
at the address where the drugs were found, which raised an inference that he
lived there[11]
and a sixth link.  Id.  A final, weaker link was Evans’s possession of
$160 in twenty-dollar bills on his person even though he was unemployed.  Id.  The court concluded that the sum total of the circumstantial evidence was
sufficient to support a rational jury’s finding beyond a reasonable doubt that
appellant exercised actual care, custody, control or management of the
contraband.  Id. at 166.

                        We will
examine, then, the links urged by the State as well as the record evidence to
determine if the evidence was sufficient to support a rational jury’s finding
beyond a reasonable doubt that appellant exercised actual care, custody,
control or management of the contraband.

 

Was appellant present when the
search was conducted?

                        No witness
places appellant at the Buda house on the day of the search.  The State argues
in its brief that “witness testimony established at least Appellant’s guilty
knowledge if not his actual presence in the home at or near a time when
Methamphetamine was being cooked:  Lynda Pyron saw Appellant ‘throw away’ parts
of a Methamphetamine cook.”  This testimony refers to the episode in late March
or early April 2005 when appellant and Pyron returned to the house from a trip
and discovered two boxes of glassware and paraphernalia presumably belonging to
“Jeff” that appellant then discarded.  Pyron testified that appellant was
angry, had an angry exchange with “Jeff,” and that Jeff no longer lived at the
house after the incident.  This incident was not “at or near 

 class=Section2>

the time” of the search and is not
the subject of the indictment.[12] 
While one could argue that this evidence showed appellant’s consciousness of
guilt rather than that it was exculpatory, the State did not introduce any
evidence—circumstantial or direct—to support this theory.  No evidence placed
appellant at the Buda residence at or about the time of the search.

 

 Was the contraband in plain
view?

                        The State
does not rely on this factor to establish a link.  Regarding the factor of
whether the contraband was in plain sight, Officer Villanueva testified that
when the officers entered the house, they observed in plain view some powdery
residue on a glass tray, a small scale, and Ziploc baggies in the kitchen, and
jars containing clear liquids with some white residue in a washroom where a
washer and dryer were located.  In the course of the execution of the search
warrant, two of the bottles seized that contained methamphetamine were seized
from a kitchen cabinet.  The speeding citation was seized in one of the
bedrooms.

                        Stapp
testified that crystal methamphetamine has a unique appearance and he
identified the baking dish as containing methamphetamine.  He also testified
that the officers extracted samples of the various material to be analyzed by
the DPS lab.

                        Many of the
items seized were seized in the brush behind the house.  Hays County deputy
sheriff Todd Riffe testified that he seized various items from “the brush line
behind the house,” including boxes of Equaline allergy medicine located in a
hunting bucket, six glass 

 class=Section3>

containers, seven plastic funnels,
a methamphetamine pipe, three burners, plasticware, two glass dishes, a
six-weight test strip, coils of plastic tubing, a baster and gloves located in
a tool case, 456 empty pseudoephedrine pill tablets, and plastic tubing.  He
also seized a glass condenser tube located on the living room floor of the
residence.  Riffe testified that these were items “previously used for the
production of methamphetamine.”  The items “in plain view” formed the basis for
the search warrant.  Other than that, there was sparse testimony about the location
of the various items seized.  The State did not present testimony regarding the
visibility of the items seized, nor was it shown whether appellant and the
various occupants had access to the entire house or to areas where the
contraband was seized. There was simply no evidence from which a rational fact
finder could conclude that appellant had knowledge that the drugs were
there—even if one could establish appellant had been in the house.

 

Was appellant in close proximity
to the narcotics and were they accessible?

                        There was
no evidence that, on the day in question, appellant was in close proximity to
or the contraband was accessible to appellant.  The State urges that appellant
“discarded” methamphetamine in the back seat of Detective Spriegel’s squad car
when he was transported to the jail.  Although Spriegel “believed it to be
methamphetamine,” the State does not assert that the powder was tested or
weighed or cite us to the record references where it was.  Our review of the
record does not show that the baggy of “white crystalized substance,” State’s
Exhibit 9A, was analyzed or tested.  In addition, both appellant and Forester
were in the back seat of Spriegel’s squad car, and the testimony is sparse
about any link to one person rather than the other, except that it “looked as
if it was going to be more towards the center of the car, but it was closest to
Mr. Pierce.”

 class=Section4>

Was appellant under the
influence of narcotics when arrested?

                        The State
does not rely on this factor, and there is no evidence that appellant was under
the influence of narcotics at the time of his arrest.

 

Was appellant in possession of
contraband when arrested?

                        Except for
the circumstantial evidence of the baggy of “white crystalized substance” found
underneath the seat in Spriegel’s squad car, there is no evidence of any
contraband found in appellant’s possession. The strongest evidentiary link to
“possession” of contraband, then, is the baggy of “methamphetamine,” State’s
Exhibit 9A, found underneath the back seat in the patrol car.  As to State’s
Exhibit 9, consisting of some smaller Ziploc bags and a large Ziploc bag
containing a plastic box with samples, Budge testified only that he removed one
of the items and “put it in another container.”  Even if these items contained
methamphetamine, the record is not clear as to the weight of State’s Exhibit 9A
or the items in State’s Exhibit 9.[13]

Did appellant make incriminating
statements when arrested?

                        The State
does not rely on this factor, and there is no evidence of any statements made by
appellant at the time of his arrest.

 

Did appellant attempt to flee?

                        The State
argues that there was evidence that appellant “behaved as a guilty party by
running through open fields and looking over his back with Forester, a suspect
who was actually observed by [Officer] Stapp at the residence when it was
raided.”  The evidence as adduced does not show that appellant fled from the
residence.  Although flight is ordinarily a circumstance from which an
“inference of guilt” may be drawn, here the evidence does not place appellant
at the crime scene or even in proximity to it.  He was observed with Forester
approximately a half-mile from the residence an hour after the officers entered
the Buda residence.  Other than the speeding citation and testimony that
appellant had lived at the Buda residence prior to June, there was no evidence
linking appellant to the searched premises much less to the contraband.  One
officer testified that the two men were found within a fifteen-minute walk from
the Buda residence.  With appellant’s prior record of drug offenses, the proof
is just as consistent with Forester alerting appellant to the search and the
presence of the officers in the vicinity.  It is, in any event, not proof of
care, custody, control or management over the contraband.

                        Although
evidence of flight is admissible, it is not grounds for a presumption of guilt,
Solis v. State, 492 S.W.2d 561, 563 (Tex. Crim. App. 1973); Ysasaga
v. State, 444 S.W.2d 305, 308 (Tex. Crim. App. 1969), overruled on other
grounds, Chambers v. State, 711 S.W.2d 240 (Tex. Crim. App. 1986),
and it is not evidence that would logically support a finding of actual care,
custody, control or management beyond a reasonable doubt.

 

Did appellant make furtive
gestures?

                        The State
does not rely on this factor, and there is no proof of any furtive gestures
made by appellant.

 

Was there an odor of contraband?

                        The State
does not rely on this factor.  The only testimony about odor came from Officer
Stapp who testified to the “unmistakable odor”of methamphetamine through the
open window of the residence.  Stapp also testified that he did not notice any
stains on appellant’s clothing.  Spriegel, the officer who transported
appellant and Forester to jail, did not recall smelling any odor of “amphetamine”
or observing any stains on appellant’s hands.  The evidence regarding odor does
not serve to link appellant with possession of the contraband.

 

Was other contraband or drug
paraphernalia present?

                        The State
argues that appellant “owned the home where a Methamphetamine lab was being
run.”  The record references cited by the State do not support this statement. 
The State cites to the following testimony by Officer Villanueva regarding the
anonymous telephone call:

 

Q.        Did the
caller indicate who owned that property?

 

A.        The caller
told me that she was staying with a man by the name of John Pierce.

 

 

Although the officers corroborated
that the house itself existed, there is no evidence that anyone verified who
owned the house.  As Villanueva testified, after receiving the anonymous call,
“We corroborated that the house did exist, that it was on that street, and that
there was a black Chevy Blazer.”[14] 
Dolores Burnet testified that it was appellant’s home even though he was not
living there and she had not recently seen him there.  In addition to
quantities of liquids and the finished product of methamphetamine, there were
numerous items seized from inside the home and in the brush behind the house
that would be probative on the issue of whether a methamphetamine lab was in
existence at the residence.  But this evidence does not serve to link appellant
to possession of those items.

 

Did appellant own or have the
right of possession to the place where the drugs were found?

                        Asserting
that appellant “owned” the home, the State presented as evidence a single
“affirmative-link” document to connect appellant to the residence.[15] 
The State argues in its brief: “[A] speeding ticket found on a desk in a
bedroom of Appellant’s house, evidenced Appellant’s actual presence in the
home.”  The citation was dated December 4, 2004, more than six months before
the search.  The testimony at trial showed that appellant had lived at the
residence, but had moved in May, and no longer lived there.  The prosecutor
complained that appellant’s witnesses did not present evidence showing
appellant was living elsewhere, but it was the State’s burden to prove any
links to establish possession.  There was no proof of ownership of the
residence, utility listings, or other indicia of ownership or possession.  No
other documents were found or seized that connect appellant to the residence. 
No evidence was introduced that showed any of the vehicles on the premises
belonged to appellant.  The only evidence introduced regarding appellant’s vehicle
showed that he drove a truck and a silver Dodge.  Neither vehicle was found on
the premises.  Evidence showed only that people lived at the house from time to
time and moved from the house from time to time.  Appellant was one of those
people.

 

Was the place(s) where the drugs
found enclosed?

                        The State
does not rely on this factor and we have previously discussed that some of the
items seized were in plain view.  The drugs were not found in spaces or in
items that were linked in any manner to appellant.

 

Was appellant found in
possession of a large amount of cash?

                        The State
does not rely on this factor nor was there any evidence concerning any money
seized at the house or from appellant at the time of his arrest.

 

Did appellant’s conduct indicate
a consciousness of guilt?

                        The State
argues only that appellant’s attempt to flee was consciousness of guilt.

 

                        Having
examined the links urged by the State, we conclude that the evidence is 

 class=Section5>

legally insufficient to support the
jury’s finding beyond a reasonable doubt that appellant exercised actual care,
custody, control or management of the contraband.  In contrast to Evans,
here, the evidence of any links is sparse and insufficient.  Cf. Evans,
202 S.W.3d at 163.  No direct or compelling evidence exists to support any of
the linkage factors.  The State’s evidence touches only on two of the many
possible linkage factors—the evidence of possible flight and the seizure of a
citation in appellant’s name in one of the bedrooms.  Although flight is
ordinarily a circumstance from which an “inference of guilt” may be drawn, here
the evidence does not place appellant at the crime scene or even in proximity
to it.  Nor does the traffic citation bridge the evidentiary gap.  A single
item of evidence more than six-months’ old does not provide the “independent
facts and circumstances” that would show possession beyond a reasonable doubt. 
See Poindexter, 153 S.W.3d at 405-06; Brown, 911 S.W.2d at
747-48.  Nor does the evidence that appellant at one time lived at the residence. 
No witness placed appellant at the residence during the relevant time period. 
When an accused is not in exclusive possession and control of the place where
contraband is found, it cannot be concluded that he had knowledge or control
over the contraband unless evidence connects him to the drugs to the requisite
level of confidence beyond a reasonable doubt.  Poindexter, 153 S.W.3d
at 405-06.  While the number of applicable factors is not as important as the
logical force of those factors, they must establish the elements of the
offense.

                        The
evidence may well have established the existence of a methamphetamine
manufacturing operation with which certain of the persons present on the
premises could be connected.  The jury was unable to reach a verdict on that
count as to appellant.  A rational trier of fact could find that the State
proved that the aggregate weight of the methamphetamine in the residence
exceeded 200 grams, establishing this element of the offense of possession. 
But the State 

 class=Section6>

was required to establish that
appellant exercised custody and control over the methamphetamine and that he
had knowledge that the substance in his possession was contraband.  Except for
the discarded baggy found in the patrol car underneath the seat between appellant
and Forester, there is nothing with any “logical force” that would connect
appellant to the actual care, custody, control, or management over the
contraband.  We conclude that these links are insufficient to connect appellant
to the contraband so that a rational fact finder could find the element of
possession beyond a reasonable doubt.  Measured against the appropriate
standard of review, the evidence is legally insufficient to support appellant’s
conviction for possession of methamphetamine.

 

                                                                CONCLUSION

                        Accordingly,
we hold that the evidence offered by the State was legally insufficient to
support the jury’s verdict.  Therefore, we sustain appellant’s first issue. 
Because we sustain this issue, we need not reach appellant’s second issue
regarding factual sufficiency.

                        We reverse
the judgment of the trial court and render a judgment of acquittal.

 

 

            __________________________________________

                                                                        Jan
P. Patterson, Justice

Before Justices Patterson, Puryear
and Pemberton

Reversed and Acquittal Rendered

Filed:   December 5, 2007

Do Not Publish









[1]  The trial court declared
a mistrial as to a second count of possession of chemicals with intent to
manufacture methamphetamine.





[2]  Evidently, the warrant
the officers were executing was not a felony arrest warrant.





[3]  Appellant does not
challenge the officers’ entry of the house.





[4]  The record does not show
what that description was.





[5]  Although the warrant
itself is included as an exhibit, the affidavit incorporated therein is not. 
Nevertheless, appellant does not challenge the warrant or the forced entry by
the officers.





[6]  Villanueva testified
that he did not attempt to lift fingerprints from any of the items found at the
residence.  Stapp could not recall whether the officers attempted to lift
fingerprints, but that none were recovered in the case.  He testified that he
could only recall one instance in a narcotics case in the last ten years when
the officers were able to retrieve fingerprints.  In response to the
prosecutor’s question, “And so in that 2,000 some-odd investigations, you’ve
gotten one good print that you can recall?”  Stapp answered, “Right.”  He
further testified that it depended on the situation whether the task force
attempted to obtain fingerprints from the evidence.





[7]  Taylor testified that
the item seized was the traffic citation in appellant’s name on a desktop in a
bedroom designated Bedroom I, and that officers use “those items that identify
a person to link them with a residence, to identify them as a person that lives
at a specific residence.”  Although Taylor testified that these documents often
include “driver’s licenses, utility bills, citations . . ., different types of
mailings, magazine[s], those types of things,” Taylor “did not find any
others.”





[8]  On cross-examination,
Budge testified that the exhibit “real rough” contained 1.3 “grams of pure
meth” and 219 grams of adulterant. 





[9]  Officer Villanueva
testified that on the day in question Burnett told him that “Kenny” was in the
kitchen “cooking something.”  The registration for one of the vehicles came
back to Kenneth Rictoby of Burnet, Texas.  When an officer answered a cell
phone found near the house, the caller asked to speak with “Kenny.”  There was
no evidence that any of the vehicles were registered to appellant. 





[10]  The indictment
charges appellant with possession on or about June 23, 2005, of methamphetamine
in an amount by aggregate weight, including adulterants and dilutants, of 200
grams or more but less than 400 grams.





[11]  The
evidence showed that the officers found “a lot of letters” in the mail slot
with Evans’s name on them.





[12]  The State
does not argue that the “on or about” language of the indictment was intended
to include this incident.  Moreover, this evidence is more probative of the
manufacturing charge than of possession since there was no testimony of the
existence of any drugs.





[13]  Budge’s lab
report was excluded from evidence on hearsay grounds, and Budge’s testimony
regarding the presence of methamphetamine speaks in terms of items, not exhibits. 
Although Budge testified as to the weight of various items, including item nos.
1A, 1B, 2, 9, 15, 30 and 32, there is nothing in the record to cross-reference
the item number with the corresponding exhibit number.  For example, item no. 9
is not the same as State’s Exhibit 9 or 9A because Budge testified that item
no. 9 was a bottle containing a “gray substance” that he was unable to open.

 

                  In
his final argument when he totaled the aggregate weight of the methamphetamine
in the various exhibits, the prosecutor asserted that the State had proved that
the exhibits included 264.5 grams of “substances including adulterants and
dilutants that contained a controlled substance methamphetamine,” which was
within the range alleged in the indictment.  This total, the prosecutor argued,
included the methamphetamine found in the two bottles and the tray, but
“excludes the methamphetamine that was found in the patrol vehicle.”  Appellant
does not challenge whether the baggy in the patrol car was tested and contained
quantities of methamphetamine; he argues only that the officers failed to test
the baggy for fingerprints and DNA.





[14]  There was
also no evidence linking appellant to the black Chevy Blazer or any other
vehicle referred to by the anonymous caller.  Although the caller claimed that
appellant was driving the Blazer, testimony at trial showed that appellant
drove a white, flatbed truck and a silver Dodge.  The Dodge was evidently the
vehicle for which appellant received the citation.  Later, when the officers
verified the ownership of the Blazer, they learned the vehicle was not
registered to appellant. 





[15]  One of the
officers testified that it was “normal procedure” to take only one
“affirmative-link” document even though there may be numerous items of evidence
linking an individual to the premises.  Villanueva testified that he was not
aware of any personal items at the residence that belonged to appellant other
than the citation.  Other than the citation, then, the officers found “nothing”
else belonging to appellant “that we took as evidence.”