# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00492-CR

**John Merritt Pierce, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT
### NO. CR-05-639, HONORABLE WILLIAM HENRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

John Merritt Pierce appeals his conviction for possession of methamphetamine in an amount of 200 grams or more but less than 400 grams. *See* Tex. Health & Safety Code Ann. §§ 481.102 (West Supp. 2006), .115(a), (e) (West 2003). After the jury found appellant guilty as to possession,[1] the trial court assessed punishment at 39 years' confinement as enhanced by a prior conviction. In two issues, appellant challenges the legal and factual sufficiency of the evidence to support his conviction for possession of methamphetamine. Because we sustain the challenge to the legal sufficiency of the evidence to support the verdict, we reverse the trial court's judgment and render a judgment of acquittal.

---

[1] The trial court declared a mistrial as to a second count of possession of chemicals with intent to manufacture methamphetamine.

**BACKGROUND**

According to the State's evidence at trial, on the afternoon of June 23, 2005, Detective Tommy Villanueva of the Hays County Narcotics Task Force unit of the San Marcos Police Department received an anonymous telephone call that a fugitive, Dolores Burnett, with an escape warrant from Travis County, could be found at a residence at 2735 FM 2001 in the town of Buda in Hays County. The caller also advised the officer that Burnett was "staying with a man by the name of John Pierce," that the residence was "a place where a lot of people do methamphetamine and cocaine," and that there would be a black Chevy Blazer and possibly a blue Mitsubishi vehicle "that was supposedly Dolores Burnett's vehicle" located at the residence.

Villanueva verified the existence of the warrant and learned that Burnett had a warrant for an unauthorized absence from a community corrections facility. At trial, the State introduced into evidence a printout from a law enforcement database showing the existence of a "flight escape warrant" as well as an additional warrant for Burnett for possession of methamphetamine in violation of her probation.

San Marcos police officers conducted a drive-by investigation of the residence, verifying the location and existence of the residence and the black Chevy Blazer. Because the house was located 100-150 feet from the road, they were unable to see the license plates of vehicles parked close to the residence. They confirmed that a black Chevy Blazer was parked at the residence along with other vehicles.

Based on the information received from the anonymous caller and their observations, at mid-afternoon the officers approached the residence to knock on the front door and to serve the

2

warrant on Burnett. Villanueva testified that the officers waited on the blue vehicle that supposedly belonged to Burnett, but then they decided to knock on the door and ask if she was there. As other officers "set up a loose perimeter around the residence," Sergeant Chase Stapp, a sergeant with the San Marcos Police Department and the commander of the Hays County Narcotics Task Force, approached the southwest corner of the house to observe the side of the house in the event someone tried to flee. Stapp explained the purpose of a "knock-and-talk" investigation:

> You try to make contact with someone at a location and obtain their cooperation in conducting your investigation whether it be for a warranted person or to find drugs, which is commonly what we do, or anything else. . . . You knock on the door, you hope to make contact with someone, and talk to them about whatever it is you're investigating. We do these to, again, try and find drugs sometimes where we don't have a search warrant in hand, but we want to elicit cooperation from people. We also do these many times to try to serve arrest warrants. The law would allow us to breach a door or break down a door to serve a felony arrest warrant if someone—if your suspect actually lives there, but if they don't, we—if they're staying at a friend's house, for example, or hiding out or whatever, we may knock on that door and try to get someone to answer the door and just ask if the wanted person is there.[2]

As he moved close to an open window of the house, Stapp smelled the "unmistakable odor" of methamphetamine and observed through the window a man, later identified as Shane Forester, and an unidentified woman inside the house. The woman was walking quietly past the door in an attempt, Stapp testified, to avoid detection of the officers at the front door. Stapp observed the man carrying a blue "kind of a" square object into the room. When the man saw Stapp at the window, he ran towards the living room. When no one responded to Villanueva's knock at the front door, Stapp authorized him "to kick the front door open." Stapp testified that he was concerned that

---

[2] Evidently, the warrant the officers were executing was not a felony arrest warrant.

3

evidence might be destroyed or weapons obtained, so he authorized an entry into the house based upon exigent circumstances.[3]

When the officers entered the house at approximately 2:45 p.m., Dolores Burnett, who was taking a shower, was the only person present. Stapp testified that Burnett was not the female he observed through the window. The officers "cleared the house" and found no one else present in the house. The man and woman Stapp saw through the window were not found in the house. The officers observed debris outside one of the windows of the house, indicating that someone had escaped through the window into a large open field behind the house. Stapp testified that "[t]hey got out the side window and dropped some belongings on the ground and the blinds had been moved outside the window." The officers found evidentiary items, including plastic tubing and tape, stashed in a brushy area behind the house. Villanueva testified that the officers also found a cell phone and a belt buckle on the ground.

Villanueva testified that, as the officers "cleared" the house looking for additional occupants, they observed in plain view in the kitchen "a square glass tray with some powdery residue, a small scale, and small Ziploc baggies." Villanueva testified that the items he observed were consistent with "the manufacturing of methamphetamine:"

> In the washroom where the entry was made by the other officers, detectives observed in plain view two glass jars inside a soft-sided bag: one jar contained clear liquid with some white residue, and the second jar contained some clear liquid.

---

[3] Appellant does not challenge the officers' entry of the house.

4

After a search of the house looking for individuals who might be present, the officers started looking around the property for the individuals. They searched an outbuilding, or "shed," and also saw the blue Mitsubishi automobile parked in back of the house. After "clearing" the outbuilding and finding no one there, the officers began to search more widely for the individuals they believed had fled from the house. Officers spoke with employees at a nearby cabinet shop who had seen "people going through here." The employees provided "a very basic description of the suspects"[4] that the officers passed on to other law enforcement officers, including other members of the Hays County Sheriff's Office, the Department of Public Safety Air Unit, the San Marcos Police Department Canine Unit, and the United States Marshals, who assisted in the search.

As the officers continued their search for the individuals, Villanueva left the residence and proceeded to seek a search warrant which was issued by a magistrate later that afternoon at 5:05 p.m. Other officers remained at the house to secure the premises until the search warrant could be obtained.

Meanwhile, United States Marshals were in nearby Niederwald looking for a fugitive in an unrelated case. U. S. Deputy Marshal Tom Shaddix testified that he observed two individuals running in an open field "quite a distance off the road." The two men would run and occasionally stop to see if they were being followed. The marshal's first impression was that the men were being chased by a dog or a bull. As Shaddix continued to drive down the road, the two men continued to run, and then stop and walk, and then run again until Shaddix lost sight of them. As Shaddix waited for another officer, a Hays County officer advised him that "some individuals" had run from a house

---

[4] The record does not show what that description was.

5

where the officers were attempting to execute a "search warrant" and asked him if he had seen anybody. After executing the arrest for which they were in the area, at the request of the Hays County officers, the marshals assisted in the search for the men who had fled the Buda residence.

Shortly thereafter, Shaddix again saw two men near the road, one coming out of a brushy area on the edge of the road and a second man running in the opposite direction from the marshals. The first man was "not moving." As he watched, an old Suburban vehicle coming in Shaddix's direction stopped, picked up the second man who was running, made a u-turn "in the middle of the road spinning his tires," and headed back in the direction from which it had come. Shaddix testified:

> It appeared he was trying to get away in a hurry. I proceeded after him, got behind him, activated my lights and siren, attempted to pull him over. The individual driving made a right turn onto another road that I do not know the name of. I proceeded behind them probably a quarter to a half mile down the road until it ended, at which time they stopped—the vehicle stopped.

Shaddix detained the two men until Hays County officers arrived. Shaddix placed the car's passenger, the man who had been running, in handcuffs. At trial, Shaddix testified that the passenger appeared extremely "wet from sweat," flustered, and nervous. The driver was nervous but not sweating.

U.S. Deputy Marshal Eric McGill, who apprehended the other individual on the road, testified that he saw the two men go "up a ditch," "they were in the weeds," and then "cross a field." He then saw the men as one jogged along the road and the other walked on the side of the road. The individual walking along the road was shirtless and was cut up, bleeding, and sweaty. McGill lost

6

sight of the men until he turned down another road and saw the men again. He approached one of the men and asked whether anything was wrong. The man replied that he was fine and kept walking. McGill testified that when he initially approached the man, "I was under the misunderstanding that we were actually looking for Hispanic individuals, and this was a white male." McGill then stopped his vehicle, showed his badge, and asked the man what he was doing. The man told McGill that he was "there to meet somebody about a job." McGill testified that because he thought the individual might have fled from the Buda house and was one of the individuals sought by the local officers, he told the man: "I'm not arresting you, but I am going to detain you until we identify you." He then detained the man, later identified as appellant, for identification purposes. McGill brought appellant to the location where Shaddix had detained the two men in the Suburban—the passenger was later identified as Shane Forester, and the driver was his brother, Hoyt. The marshals turned appellant and Shane Forester over to the officers and released Hoyt Forester.

The record reflects that the three men were detained in the 3000 block of Windy Hill Road, approximately a quarter to one-half mile from the Buda residence. Officer Carl Spriegel of the Hays County Narcotics Task Force arrived and took custody of appellant and Shane Forester from the U.S. Marshals. Spriegel, who also participated in the execution of the arrest warrant at the Buda residence, described appellant and Forester when he first saw them in the custody of the marshals:

> Very disheveled looking; they were very sweaty; they were covered in what we refer to as beggar's lice, the—it's black material when you go through a field, it attaches to your clothing and whatnot—they were covered head to toe in this beggar's lice.

7

Spriegel recalled that one of the men was shirtless. After handcuffing appellant and Forester and frisking them for weapons and contraband—which they did not find—Spriegel seated them in the back seat of his squad car and transported them to the Hays County jail.

On their way to the jail, Spriegel drove by the Buda residence for Officer Stapp to view the two men. Stapp came over to the police vehicle and identified Forester as the man he saw through the window carrying the blue object; Stapp testified that he had not observed appellant at the house. When Spriegel arrived at the jail and unloaded the two suspects, he found a "little baggy of a white crystalized substance" underneath the rear seat of the car. Spriegel observed that the baggy was "extremely wet," "literally dripping with perspiration," and there was actually perspiration on the inside and outside of the baggy. The State designated the baggy as State's Exhibit 9A.

In his testimony, Spriegel explained that he generally operates a marked patrol unit and that every time he operates the unit he conducts a search of the vehicle. He testified that before each use of the vehicle he searches the entire car, including the back seat and every place "that you can conceal something." In describing the location of the baggy "underneath the rear seat," Spriegel testified: "It was—it looked as if it was going to be more towards the center of the car, but it was closest to Mr. Pierce." On cross-examination in response to questioning on the location of the baggy, Stapp testified that the baggy was underneath the seat of the car "between the padding of the seat and the rubber padding that lines the floor of the car of approximately an inch, and it was in that area," in the "void between the seat back and seat cushion itself." Stapp testified that it was "possible" that either person sitting in the back seat could have dropped the baggy.

8

After the officers obtained the search warrant, they conducted a search of the house and premises, seizing "approximately 32 items of evidence" and photographing the evidence and the house. Villanueva testified to the conduct of the search[5] and the seizures he made. In a closed kitchen cabinet located to the right of the kitchen sink, he found two 20-ounce plastic bottles, one filled with liquid separating into two distinctive layers. He also seized the scale and baggies observed on the kitchen table during the initial sweep of the house. The baggies were empty; in Villanueva's experience, they "are usually used to carry small amounts of any narcotic." Villanueva testified that the officers photographed the bottles, measured the liquids inside, and took samples of the liquid for testing. Villanueva picked up a cell phone laying on the ground, next to the house. When it rang and Villanueva answered it, a voice on the other end asked to speak to "Kenny." The telephone was not fingerprinted. After the officers seized and photographed the evidence and crime scene, most of the materials were then disposed of as hazardous waste by a clean-up crew. No fingerprints were retrieved from the house or evidence.[6]

Some of the evidence was found in a bin in a brushy area behind the house. The items included cold medicine containing pseudoephedrine, plastic tubing, tape, power strip, hot plates, glassware of various types, funnels and dishes used for drying the final product. The officers

---

[5] Although the warrant itself is included as an exhibit, the affidavit incorporated therein is not. Nevertheless, appellant does not challenge the warrant or the forced entry by the officers.

[6] Villanueva testified that he did not attempt to lift fingerprints from any of the items found at the residence. Stapp could not recall whether the officers attempted to lift fingerprints, but that none were recovered in the case. He testified that he could only recall one instance in a narcotics case in the last ten years when the officers were able to retrieve fingerprints. In response to the prosecutor's question, "And so in that 2,000 some-odd investigations, you've gotten one good print that you can recall?" Stapp answered, "Right." He further testified that it depended on the situation whether the task force attempted to obtain fingerprints from the evidence.

9

also seized charcoal lighter fluid that they testified is a solvent that can be used to extract a chemical during the cooking process, red phosphorus, eleven boxes of pseudoephedrine used to "synthesize into methamphetamine," a condenser tube, and a triple-beam scale.

Laray Taylor, a detective with the San Marcos Police Department, also assisted with the execution of the search warrant. Taylor testified that he personally seized various items from the residence, including Red Devil Lye, acetone, muriatic acid, pipes used to smoke methamphetamine, a woman's driver's license, some hydrocodone, an unknown tablet, and some methamphetamine in a tray. Taylor scraped the methamphetamine out of a glass tray and placed it in a baggy. He also testified that he seized "an affirmative-link document,"[7] which was a traffic citation dated December 2, 2004, issued to appellant and located on a desktop in one of the bedrooms. Admitted into evidence, the citation showed appellant's residence as 2735 FM 2001 and the vehicle for which the citation was issued was a 1994 silver Dodge automobile. The citation showed that appellant received a ticket in Bastrop County for traveling at a speed of 85 miles per hour in a 60-mile-per-hour zone. The citation also showed that appellant received a warning for displaying an expired registration sticker and for failing to have insurance.

Hays County deputy sheriff Todd Riffe testified that he seized various items from "the brush line behind the house" including boxes of Equaline allergy medicine located in a hunting bucket, six glass containers, seven plastic funnels, a methamphetamine pipe, three burners,

---

[7] Taylor testified that the item seized was the traffic citation in appellant's name on a desktop in a bedroom designated Bedroom I, and that officers use "those items that identify a person to link them with a residence, to identify them as a person that lives at a specific residence." Although Taylor testified that these documents often include "driver's licenses, utility bills, citations . . ., different types of mailings, magazine[s], those types of things," Taylor "did not find any others."

plasticware, two glass dishes, a six-weight test strip, coils of plastic tubing, a baster and gloves located in a tool case, 456 empty pseudoephedrine pill tablets, and plastic tubing. He also seized a glass condenser tube located on the living room floor of the residence. Riffe testified that these items were "previously used for the production of methamphetamine."

Joel Budge, the supervisor of the DPS drug analysis lab, testified that he was the chemist who conducted tests on various exhibits in the case. Budge testified that the exhibits believed to contain controlled substances were submitted to him, and certain of the exhibits were analyzed and found by him to contain methamphetamine. As to two of the exhibits that contained methamphetamine, Budge testified: "Using the officers' pictures and their descriptions from—that were given to me, I determined that item No. 1A and 1B—that the total volume was probably 316 milliliters, and that corresponds to about 221 grams of total weight."[8] As to Exhibit No. 2, Budge testified that there was a top layer and a bottom layer and that he tested only the top layer. If one included both layers, the mixture that contained methamphetamine weighed 316 grams, but the top layer that he tested weighed 38 grams. Several of the other exhibits were items used in the manufacture of methamphetamine, such as iodine and pseudoephedrine pills. Budge confirmed the existence of 5.50 grams and 0.23 grams of methamphetamine in two other exhibits. Budge testified that he did not analyze exhibits marked M360, which is a manufacturer's code for hydrocodone, and Risperdal. The record does not show that Budge tested the crystallized substance in the baggy found in the squad car underneath the seat.

---

[8] On cross-examination, Budge testified that the exhibit "real rough" contained 1.3 "grams of pure meth" and 219 grams of adulterant.

11

Appellant called three witnesses to testify on his behalf, as well as Officer Villanueva. Linda Pyron testified that she had known appellant for two years, that they were intimate friends, and that appellant had been at the residence until mid-May 2005 when she helped him pack his belongings and move out of the house. Appellant was not staying at the house in June. She did not know how long appellant had lived at the house, but she knew that appellant would allow others to stay with him at the house. Pyron testified that appellant had his own business crushing cars for junkyards and that he lived in the city of Alamo, near the border, and sometimes worked in Bertram where his office was located. Pyron had traveled with appellant to both Alamo and Bertram where appellant lived in a cabin.

Pyron recounted that, in late March or early April, Shane Forester's brother, Hoyt, along with another person named "Jeff" were staying with appellant at the house. When Pyron and appellant returned home from an out-of-town trip, appellant "found things in the house that he was not happy with at all." Pyron recalled that appellant was angry and very upset and that he loaded up jars, baggies, cooking pots and "visionware" in a truck and removed the items:

> I saw him start gathering it up, looking, finding, searching through the trash, searching everywhere through his whole house. And he gathered up everything that he found, put it in a box–two boxes, actually, and put it in Jeff's truck and shortly after that, he left to go get rid of it.

Pyron testified that the items appellant disposed of had something to do with methamphetamine. She testified that when appellant threw the items away he would not let her go with him "because he didn't want to endanger me." When Jeff returned to the house, Pyron saw appellant "take Jeff to another room to talk to him," and she heard raised voices. Although Jeff continued to come and go

12

at the house, he no longer lived there. Pyron testified that she was a convicted felon, having pleaded guilty to possession of methamphetamine in 2002.

Dolores Burnett also testified on appellant's behalf. She testified that she was in the shower when the officers arrived and knocked on the front door of the residence. Appellant was a long-time friend, and Burnett had previously stayed at the house. Although Burnett testified that the residence "was [appellant's] home" and he told her she could stay there, she had not stayed at the house recently and was aware that he was no longer living at the house. She was "not sure" who was living at the house and, on the morning in question, saw only Shane Forester and a person named "Wendy" at the house:

> I think it was Wendy and Shane that was living there, I'm not sure. I had seen a lot of people there a couple of times. Sometimes there was Hoyt, Faith, Wendy, and Shane. But just that morning I just saw Wendy and Shane.

She was not sure whether an individual named Kenny Rictoby was there that day. [9]

Burnett testified that she arrived at the house in her car at approximately 10:00 p.m. and then slept in her car parked behind the house until later that night. At about 3:00 or 4:00 a.m., Burnett entered the house and fell asleep on the couch. She testified that she slept until mid-afternoon when she got up to take a shower: "I went in and fell asleep on the couch and woke up and went straight to the shower, and that's when the cops came in." Although she testified that

---

[9] Officer Villanueva testified that on the day in question Burnett told him that "Kenny" was in the kitchen "cooking something." The registration for one of the vehicles came back to Kenneth Rictoby of Burnet, Texas. When an officer answered a cell phone found near the house, the caller asked to speak with "Kenny." There was no evidence that any of the vehicles were registered to appellant.

she did not see appellant at the house that day, on cross-examination Burnett testified that she did not know who was on the property that day and that it was "possible" appellant was at the house that day.

Burnett admitted that she had fled the treatment facility and that "pretty much" the first place she went was a place where she knew methamphetamine was available. Burnett testified that she has a record of three or four felonies and "a couple of misdemeanors," was on probation in Travis County, and that she had walked away, or escaped, from the treatment facility. At the time of trial, she was on probation for escape and for possession of methamphetamine.

Appellant's next-door neighbor testified that she had lived on the property next door to appellant until he moved out prior to June. He was a "nice neighbor." After appellant left, she often saw other people at the house and knew appellant was no longer living there. On the day in question, she saw two "guys" who were at the house "take off running;" she was unaware appellant was found in the vicinity. Appellant did not testify.

At the end of trial, the jury found appellant guilty of possession of methamphetamine, and a mistrial was declared on a count of possession of chemicals with intent to manufacture methamphetamine. This appeal followed.

## DISCUSSION

On appeal, appellant challenges the legal and factual sufficiency of the evidence to support the conviction. Specifically, appellant urges that the State failed to "affirmatively link" him to the contraband. Because the evidence is legally insufficient to support the verdict, we will confine our discussion to that ground because it is dispositive of this appeal. *See* Tex. R. App. P. 47.1.

14

In a legal sufficiency review, we view the evidence in the light most favorable to the verdict and decide whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *Hampton v. State*, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005); *Moff v. State*, 131 S.W.3d 485, 488 (Tex. Crim. App. 2004). In addition, we should "determine whether the necessary inferences are reasonable based upon the cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007).

We consider all evidence the jury was permitted to consider. *Moff*, 131 S.W.3d at 488. The jury is the sole judge of the credibility of the witnesses and of the weight assigned to their testimony and may accept or reject any or all of a witness's testimony. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). We resolve any inconsistencies in the evidence in favor of the verdict. *Id*.; *Matson v. State*, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991); *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson*, 819 S.W.2d at 846.

The State is required to prove every element of the offense set forth in the indictment beyond a reasonable doubt.[10] *See Juarez v. State*, 198 S.W.3d 790, 793 (Tex. Crim. App. 2006) (stating that elements of offense must be charged in indictment, submitted to jury, and proven by State beyond reasonable doubt). A person commits the offense of possession of a controlled

---

[10] The indictment charges appellant with possession on or about June 23, 2005, of methamphetamine in an amount by aggregate weight, including adulterants and dilutants, of 200 grams or more but less than 400 grams.

substance if he knowingly or intentionally possesses it. Tex. Health & Safety Code Ann. § 481.115(a). Under this indictment, the State had to prove beyond a reasonable doubt that the accused (i) intentionally or knowingly (ii) possessed, *i.e.*, exercised actual care, custody, control, and management over methamphetamine (iii) in an amount of more than 200 grams but less than 400 grams on or about the date set forth in the indictment. *See* Tex. Health & Safety Code Ann. §§ 481.002(38), .112(a); *Poindexter v. State*, 153 S.W.3d 402, 405-06 (Tex. Crim. App. 2005); *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995). The State alone has the burden of proving beyond a reasonable doubt every essential element of the offense charged. *Wright v. State*, 603 S.W.2d 838, 840 (Tex. Crim. App. 1980).

When the accused is not in exclusive possession or control of the place where the contraband is found, it cannot be concluded that he had knowledge of and control over the contraband unless there are additional independent facts and circumstances linking him to the contraband. *Poindexter*, 153 S.W.3d at 405. These elements may be established by circumstantial evidence. *Id*. at 405-06; *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex. Crim. App. 1985). The evidence must establish, to the requisite level of confidence, that the accused's connection with the contraband was more than just fortuitous. *Poindexter*, 153 S.W.3d at 406; *Brown*, 911 S.W.2d at 747. This link or connection generates a reasonable inference that the accused knew of the contraband's existence and exercised control over it. *Id*. There is no set formula of facts necessary to support an inference of knowing possession. The force of these links need not be such as to exclude every other alternative hypothesis except the defendant's guilt. *Id*. at 748. Possession of contraband need not be exclusive, and evidence that shows an accused jointly possessed

16

the contraband with another is sufficient. *Martin v. State*, 753 S.W.2d 384, 387 (Tex. Crim. App. 1988); *Whitworth v. State*, 808 S.W.2d 566, 569 (Tex. App.—Austin 1991, pet. ref'd). But mere presence at the location where drugs are found is insufficient, by itself, to establish actual care, custody, control or management of those drugs. *Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006).

The State maintains that it demonstrated that appellant exercised actual care, control, custody or management over the methamphetamine at the residence and in the patrol car. As the State argued in response to appellant's motion for an instructed verdict, which was overruled:

> [T]here's plenty of evidence that the jury can use to make inferences and conclusions that suggest that Mr. Pierce was, in fact, at the house and was, in fact, involved in this incident given his behavior following the police raid upon the house.
>
> It's true he was not seen by any of the officers in the house, but he was found in close proximity there on foot, covered from head to toe with grass burs, and was cut up, which the jury can certainly make the inference that he was fleeing from the residence and trying to escape detection and escape capture. So, the jury can certainly infer that he was in the house and was involved.
>
> And he was found, along with Shane Forester who was definitely seen in the house. And there w[ere] two individuals seen running across a field. Although they were not positively identified, I find it hard to believe that there would be more than one set of two individuals running around fields in Hays County near this residence at the time of the police raid.

And in closing argument to the jury, the prosecutor acknowledged:

> John Pierce has never been seen by the detectives and was not seen by the detectives in that house on that day. And I told you that at the outset, that none of our witnesses would say that, and it shouldn't come to any great shock to anybody that we didn't produce somebody that said, yeah, they saw John Pierce in the house, because none of our detectives did.

17

As the prosecutor argued, there was no question that there was a methamphetamine lab and methamphetamine was recovered in the amount alleged in the indictment: "The real question is whether or not John Merritt Pierce had anything to do with it." Relying on the affirmative-links rule, the State argues that the evidence was sufficient to link appellant to the methamphetamine. *See Poindexter*, 153 S.W.3d at 405-06.

Appellant argues that no testimony links him to the Buda residence at the relevant time period and that no witnesses testified that he exercised care, custody, control, or management over the exhibits found to contain the controlled substance. Appellant asserts that any link to the residence was insufficient to establish his guilt, given that no one testified that they saw him at the house on the day in question and, even assuming he was linked to the residence in some manner, he was not in exclusive possession or control of the residence where the contraband was found.

In reviewing this record, we must determine whether any rational trier of fact could have found beyond a reasonable doubt that appellant knowingly or intentionally *possessed* the contraband found in the Buda residence. To obtain a conviction for possession of a controlled substance, the State must prove that the accused exercised actual care, custody, control, or management over the contraband, and that the accused knew the matter possessed to be contraband. *Whitworth*, 808 S.W.2d at 568. The trier of fact determines whether the factors presented at trial combine to link the accused and the contraband in a sufficient manner to establish guilt beyond a reasonable doubt. The number of factors present is less important than the logical force of those factors, alone or in combination, in establishing the elements of the offense. *Id*. at 569.

18

Courts have identified relevant factors that may link an accused to contraband, either singly or in combination, to establish a person's possession of contraband:

(1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

See Evans, 202 S.W.3d at 162 n.12 (citing Olivarez v. State, 171 S.W.3d 283, 291 (Tex. App.—Houston [14th Dist.] 2005, no pet.)). These are some non-exclusive factors that may circumstantially establish the legal sufficiency of the evidence to prove a knowing possession. Id.

Generally, courts have found evidence legally sufficient to show possession where the appellant actually possessed the drugs or had access to the place where the drugs were stored. Christopher v. State, 639 S.W.2d 932, 935-36 (Tex. Crim. App. 1982) (defendant had key to camper shell where drugs found), overruled on other grounds, Preston v. State, 700 S.W.2d 227, 230 (Tex. Crim. App. 1985); Martinets v. State, 884 S.W.2d 185, 188 (Tex. App.—Austin 1994, no pet.) (defendant was driver of car in which drugs found); Watson v. State, 861 S.W.2d 410, 415 (Tex. App.—Beaumont 1993, pet. ref'd) (defendant in same hotel room with warm crack pipe); Hernandez v. State, 867 S.W.2d 900, 905 (Tex. App.—Texarkana 1993, no pet.) (defendant had key to lock on spare tire where drugs found); cf. De la Garza v. State, 898 S.W.2d 376, 379

19

(Tex. App.—San Antonio 1995, no pet.) (defendant seen in possession of dufflebag containing marihuana immediately before her arrest). In *Whitworth*, this Court upheld a conviction for possession where the defendant had a key to the trunk of the car, he used the key to open the trunk, marihuana was found in the trunk, the strong odor of fresh marihuana was present, and the defendant's conduct at the time of his arrest showed consciousness of guilt. 808 S.W.2d at 569-70.

We recognize that it is the jury, not the reviewing court, that chooses between alternate reasonable inferences to be drawn from the evidence. *See Evans*, 202 S.W.3d at 165. In a legal sufficiency review, when reviewing all the evidence in a light most favorable to the verdict, courts must assume that jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences. *Id*. (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 821 (Tex. 2005)). We find *Evans* instructive. In *Evans*, the defendant argued that the evidence was legally and factually insufficient to prove, beyond a reasonable doubt, that he exercised actual care, custody, control, or management of the contraband. On appeal, the court of appeals agreed, concluding that the record evidence failed to affirmatively link appellant to the drugs other than by evidence of his presence and proximity to the drugs. *See Evans v. State*, 185 S.W.3d 30, 37 (Tex. App.—San Antonio 2005), *rev'd*, 202 S.W.3d 158 (Tex. Crim. App. 2006). In contrast, because the defendant was sitting directly in front of the drugs and they were within arms' reach, the court of criminal appeals concluded that this evidence constituted "two extremely strong 'presence' and 'proximity' links." *Evans*, 202 S.W.3d at 163. The drugs were "right under his nose," but they were also in plain view, which the court found to be a third link. *Id.* The court found a fourth link in that the defendant was alone in the house. *Id.* And when the police arrived and asked if he knew

20

why they were there, Evans replied: "Drugs." Thus, a fifth link. *Id.* Evans also received mail at the address where the drugs were found, which raised an inference that he lived there[11] and a sixth link. *Id.* A final, weaker link was Evans's possession of $160 in twenty-dollar bills on his person even though he was unemployed. *Id.* The court concluded that the sum total of the circumstantial evidence was sufficient to support a rational jury's finding beyond a reasonable doubt that appellant exercised actual care, custody, control or management of the contraband. *Id.* at 166.

We will examine, then, the links urged by the State as well as the record evidence to determine if the evidence was sufficient to support a rational jury's finding beyond a reasonable doubt that appellant exercised actual care, custody, control or management of the contraband.

*Was appellant present when the search was conducted?*

No witness places appellant at the Buda house on the day of the search. The State argues in its brief that "witness testimony established at least Appellant's guilty knowledge if not his actual presence in the home at or near a time when Methamphetamine was being cooked: Lynda Pyron saw Appellant 'throw away' parts of a Methamphetamine cook." This testimony refers to the episode in late March or early April 2005 when appellant and Pyron returned to the house from a trip and discovered two boxes of glassware and paraphernalia presumably belonging to "Jeff" that appellant then discarded. Pyron testified that appellant was angry, had an angry exchange with "Jeff," and that Jeff no longer lived at the house after the incident. This incident was not "at or near

_____

[11] The evidence showed that the officers found "a lot of letters" in the mail slot with Evans's name on them.

21

the time" of the search and is not the subject of the indictment.[12]  While one could argue that this evidence showed appellant's consciousness of guilt rather than that it was exculpatory, the State did not introduce any evidence—circumstantial or direct—to support this theory.  No evidence placed appellant at the Buda residence at or about the time of the search.

*Was the contraband in plain view?*

The State does not rely on this factor to establish a link.  Regarding the factor of whether the contraband was in plain sight, Officer Villanueva testified that when the officers entered the house, they observed in plain view some powdery residue on a glass tray, a small scale, and Ziploc baggies in the kitchen, and jars containing clear liquids with some white residue in a washroom where a washer and dryer were located.  In the course of the execution of the search warrant, two of the bottles seized that contained methamphetamine were seized from a kitchen cabinet.  The speeding citation was seized in one of the bedrooms.

Stapp testified that crystal methamphetamine has a unique appearance and he identified the baking dish as containing methamphetamine.  He also testified that the officers extracted samples of the various material to be analyzed by the DPS lab.

Many of the items seized were seized in the brush behind the house.  Hays County deputy sheriff Todd Riffe testified that he seized various items from "the brush line behind the house," including boxes of Equaline allergy medicine located in a hunting bucket, six glass

---

[12]  The State does not argue that the "on or about" language of the indictment was intended to include this incident. Moreover, this evidence is more probative of the manufacturing charge than of possession since there was no testimony of the existence of any drugs.

containers, seven plastic funnels, a methamphetamine pipe, three burners, plasticware, two glass dishes, a six-weight test strip, coils of plastic tubing, a baster and gloves located in a tool case, 456 empty pseudoephedrine pill tablets, and plastic tubing. He also seized a glass condenser tube located on the living room floor of the residence. Riffe testified that these were items "previously used for the production of methamphetamine." The items "in plain view" formed the basis for the search warrant. Other than that, there was sparse testimony about the location of the various items seized. The State did not present testimony regarding the visibility of the items seized, nor was it shown whether appellant and the various occupants had access to the entire house or to areas where the contraband was seized. There was simply no evidence from which a rational fact finder could conclude that appellant had knowledge that the drugs were there—even if one could establish appellant had been in the house.

*Was appellant in close proximity to the narcotics and were they accessible?*

There was no evidence that, on the day in question, appellant was in close proximity to or the contraband was accessible to appellant. The State urges that appellant "discarded" methamphetamine in the back seat of Detective Spriegel's squad car when he was transported to the jail. Although Spriegel "believed it to be methamphetamine," the State does not assert that the powder was tested or weighed or cite us to the record references where it was. Our review of the record does not show that the baggy of "white crystalized substance," State's Exhibit 9A, was analyzed or tested. In addition, both appellant and Forester were in the back seat of Spriegel's squad car, and the testimony is sparse about any link to one person rather than the other, except that it "looked as if it was going to be more towards the center of the car, but it was closest to Mr. Pierce."

23

*Was appellant under the influence of narcotics when arrested?*

The State does not rely on this factor, and there is no evidence that appellant was under the influence of narcotics at the time of his arrest.

*Was appellant in possession of contraband when arrested?*

Except for the circumstantial evidence of the baggy of "white crystalized substance" found underneath the seat in Spriegel's squad car, there is no evidence of any contraband found in appellant's possession. The strongest evidentiary link to "possession" of contraband, then, is the baggy of "methamphetamine," State's Exhibit 9A, found underneath the back seat in the patrol car. As to State's Exhibit 9, consisting of some smaller Ziploc bags and a large Ziploc bag containing a plastic box with samples, Budge testified only that he removed one of the items and "put it in another container." Even if these items contained methamphetamine, the record is not clear as to the weight of State's Exhibit 9A or the items in State's Exhibit 9.[13]

---

[13] Budge's lab report was excluded from evidence on hearsay grounds, and Budge's testimony regarding the presence of methamphetamine speaks in terms of *items*, not *exhibits*. Although Budge testified as to the weight of various items, including item nos. 1A, 1B, 2, 9, 15, 30 and 32, there is nothing in the record to cross-reference the item number with the corresponding exhibit number. For example, item no. 9 is not the same as State's Exhibit 9 or 9A because Budge testified that item no. 9 was a bottle containing a "gray substance" that he was unable to open.

In his final argument when he totaled the aggregate weight of the methamphetamine in the various exhibits, the prosecutor asserted that the State had proved that the exhibits included 264.5 grams of "substances including adulterants and dilutants that contained a controlled substance methamphetamine," which was within the range alleged in the indictment. This total, the prosecutor argued, included the methamphetamine found in the two bottles and the tray, but "excludes the methamphetamine that was found in the patrol vehicle." Appellant does not challenge whether the baggy in the patrol car was tested and contained quantities of methamphetamine; he argues only that the officers failed to test the baggy for fingerprints and DNA.

24

*Did appellant make incriminating statements when arrested?*

The State does not rely on this factor, and there is no evidence of any statements made by appellant at the time of his arrest.

*Did appellant attempt to flee?*

The State argues that there was evidence that appellant "behaved as a guilty party by running through open fields and looking over his back with Forester, a suspect who was actually observed by [Officer] Stapp at the residence when it was raided." The evidence as adduced does not show that appellant fled from the residence. Although flight is ordinarily a circumstance from which an "inference of guilt" may be drawn, here the evidence does not place appellant at the crime scene or even in proximity to it. He was observed with Forester approximately a half-mile from the residence an hour after the officers entered the Buda residence. Other than the speeding citation and testimony that appellant had lived at the Buda residence prior to June, there was no evidence linking appellant to the searched premises much less to the contraband. One officer testified that the two men were found within a fifteen-minute walk from the Buda residence. With appellant's prior record of drug offenses, the proof is just as consistent with Forester alerting appellant to the search and the presence of the officers in the vicinity. It is, in any event, not proof of care, custody, control or management over the contraband.

Although evidence of flight is admissible, it is not grounds for a presumption of guilt, *Solis v. State*, 492 S.W.2d 561, 563 (Tex. Crim. App. 1973); *Ysasaga v. State*, 444 S.W.2d 305, 308 (Tex. Crim. App. 1969), *overruled on other grounds*, *Chambers v. State*, 711 S.W.2d 240

25

(Tex. Crim. App. 1986), and it is not evidence that would logically support a finding of actual care, custody, control or management beyond a reasonable doubt.

*Did appellant make furtive gestures?*

The State does not rely on this factor, and there is no proof of any furtive gestures made by appellant.

*Was there an odor of contraband?*

The State does not rely on this factor. The only testimony about odor came from Officer Stapp who testified to the "unmistakable odor"of methamphetamine through the open window of the residence. Stapp also testified that he did not notice any stains on appellant's clothing. Spriegel, the officer who transported appellant and Forester to jail, did not recall smelling any odor of "amphetamine" or observing any stains on appellant's hands. The evidence regarding odor does not serve to link appellant with possession of the contraband.

*Was other contraband or drug paraphernalia present?*

The State argues that appellant "owned the home where a Methamphetamine lab was being run." The record references cited by the State do not support this statement. The State cites to the following testimony by Officer Villanueva regarding the anonymous telephone call:

Q. Did the caller indicate who owned that property?

A. The caller told me that she was staying with a man by the name of John Pierce.

26

Although the officers corroborated that the house itself existed, there is no evidence that anyone verified who owned the house. As Villanueva testified, after receiving the anonymous call, "We corroborated that the house did exist, that it was on that street, and that there was a black Chevy Blazer."[14] Dolores Burnet testified that it was appellant's home even though he was not living there and she had not recently seen him there. In addition to quantities of liquids and the finished product of methamphetamine, there were numerous items seized from inside the home and in the brush behind the house that would be probative on the issue of whether a methamphetamine lab was in existence at the residence. But this evidence does not serve to link appellant to possession of those items.

*Did appellant own or have the right of possession to the place where the drugs were found?*

Asserting that appellant "owned" the home, the State presented as evidence a single "affirmative-link" document to connect appellant to the residence.[15] The State argues in its brief: "[A] speeding ticket found on a desk in a bedroom of Appellant's house, evidenced Appellant's actual presence in the home." The citation was dated December 4, 2004, more than six months before the search. The testimony at trial showed that appellant had lived at the residence, but had

---

[14] There was also no evidence linking appellant to the black Chevy Blazer or any other vehicle referred to by the anonymous caller. Although the caller claimed that appellant was driving the Blazer, testimony at trial showed that appellant drove a white, flatbed truck and a silver Dodge. The Dodge was evidently the vehicle for which appellant received the citation. Later, when the officers verified the ownership of the Blazer, they learned the vehicle was not registered to appellant.

[15] One of the officers testified that it was "normal procedure" to take only one "affirmative-link" document even though there may be numerous items of evidence linking an individual to the premises. Villanueva testified that he was not aware of any personal items at the residence that belonged to appellant other than the citation. Other than the citation, then, the officers found "nothing" else belonging to appellant "that we took as evidence."

moved in May, and no longer lived there. The prosecutor complained that appellant's witnesses did not present evidence showing appellant was living elsewhere, but it was the State's burden to prove any links to establish possession. There was no proof of ownership of the residence, utility listings, or other indicia of ownership or possession. No other documents were found or seized that connect appellant to the residence. No evidence was introduced that showed any of the vehicles on the premises belonged to appellant. The only evidence introduced regarding appellant's vehicle showed that he drove a truck and a silver Dodge. Neither vehicle was found on the premises. Evidence showed only that people lived at the house from time to time and moved from the house from time to time. Appellant was one of those people.

*Was the place(s) where the drugs found enclosed?*

The State does not rely on this factor and we have previously discussed that some of the items seized were in plain view. The drugs were not found in spaces or in items that were linked in any manner to appellant.

*Was appellant found in possession of a large amount of cash?*

The State does not rely on this factor nor was there any evidence concerning any money seized at the house or from appellant at the time of his arrest.

*Did appellant's conduct indicate a consciousness of guilt?*

The State argues only that appellant's attempt to flee was consciousness of guilt.

Having examined the links urged by the State, we conclude that the evidence is

28

legally insufficient to support the jury's finding beyond a reasonable doubt that appellant exercised actual care, custody, control or management of the contraband. In contrast to *Evans*, here, the evidence of any links is sparse and insufficient. *Cf. Evans*, 202 S.W.3d at 163. No direct or compelling evidence exists to support any of the linkage factors. The State's evidence touches only on two of the many possible linkage factors—the evidence of possible flight and the seizure of a citation in appellant's name in one of the bedrooms. Although flight is ordinarily a circumstance from which an "inference of guilt" may be drawn, here the evidence does not place appellant at the crime scene or even in proximity to it. Nor does the traffic citation bridge the evidentiary gap. A single item of evidence more than six-months' old does not provide the "independent facts and circumstances" that would show possession beyond a reasonable doubt. *See Poindexter*, 153 S.W.3d at 405-06; *Brown*, 911 S.W.2d at 747-48. Nor does the evidence that appellant at one time lived at the residence. No witness placed appellant at the residence during the relevant time period. When an accused is not in exclusive possession and control of the place where contraband is found, it cannot be concluded that he had knowledge or control over the contraband unless evidence connects him to the drugs to the requisite level of confidence beyond a reasonable doubt. *Poindexter*, 153 S.W.3d at 405-06. While the number of applicable factors is not as important as the logical force of those factors, they must establish the elements of the offense.

The evidence may well have established the existence of a methamphetamine manufacturing operation with which certain of the persons present on the premises could be connected. The jury was unable to reach a verdict on that count as to appellant. A rational trier of fact could find that the State proved that the aggregate weight of the methamphetamine in the residence exceeded 200 grams, establishing this element of the offense of possession. But the State

was required to establish that appellant exercised custody and control over the methamphetamine and that he had knowledge that the substance in his possession was contraband. Except for the discarded baggy found in the patrol car underneath the seat between appellant and Forester, there is nothing with any "logical force" that would connect appellant to the actual care, custody, control, or management over the contraband. We conclude that these links are insufficient to connect appellant to the contraband so that a rational fact finder could find the element of possession beyond a reasonable doubt. Measured against the appropriate standard of review, the evidence is legally insufficient to support appellant's conviction for possession of methamphetamine.

## CONCLUSION

Accordingly, we hold that the evidence offered by the State was legally insufficient to support the jury's verdict. Therefore, we sustain appellant's first issue. Because we sustain this issue, we need not reach appellant's second issue regarding factual sufficiency.

We reverse the judgment of the trial court and render a judgment of acquittal.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Reversed and Acquittal Rendered

Filed: December 5, 2007

Do Not Publish

30